No. 21-1900

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

GERALD E. GROFF,

*Plaintiff-Appellant,*

v.

LOUIS DEJOY, Postmaster General, United States Postal Service,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 5:19-cv-01879-JLS
Honorable Jeffrey L. Schmehl

---

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

---

Aaron M. Streett
Christopher E. Tutunjian
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel: (713) 229-1234

Randall Luke Wenger
Jeremy L. Samek
INDEPENDENCE LAW CENTER
23 North Front Street
Harrisburg, PA 17101
Tel: (717) 657-4990

*Attorneys for Plaintiff-Appellant*
*Gerald E. Groff*

Hiram Sasser
David J. Hacker
Stephanie N. Taub
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX 75075
Tel: (972) 941-4444

David W. Crossett
CORNERSTONE LAW FIRM, LLC
8500 Allentown Pike, Suite 3
Blandon, PA 19510
Tel: (610) 926-7875

Alan J. Reinach
CHURCH STATE COUNCIL
2686 Townsgate Road
Westlake Village, CA 91361
Tel: (805) 413-7398

# **TABLE OF CONTENTS**

Jurisdictional Statement ....................................................................1

Issues Presented ..............................................................................1

Introduction ....................................................................................2

Statement of the Case ......................................................................3

    I.    USPS's rollout of Sunday deliveries for Amazon creates a conflict between work and religion for Groff. ......................................3

    II.    USPS disciplines Groff for abiding by his sincerely held religious beliefs. ..................................................................9

    III.    Groff files a Title VII action, and the district court grants summary judgment to USPS. .............................................11

Summary of Argument ....................................................................12

Standard of Review .........................................................................15

Argument .......................................................................................16

    I.    Title VII requires USPS to provide Groff with a religious accommodation. .............................................................16

    II.    The district court erroneously concluded that USPS offered Groff reasonable accommodations. ......................................18

        A.    An accommodation must eliminate the conflict between employment obligations and religious practice. .......................19

            1.    Title VII's text requires a proposed accommodation that eliminates the religious conflict. .............................20

            2.    The district court's approach conflicts with Title VII's text and *Abercrombie*. .............................................25

        B.    None of the "accommodations" offered by USPS eliminated the conflict between Sunday deliveries and Groff's religious beliefs. .............................................30

III.   The district court erroneously concluded that USPS satisfied its burden to demonstrate that granting a religious accommodation would cause undue hardship. .............................................38

    A.   Under the standard applied in current case law, USPS cannot demonstrate undue hardship..........................................38

        1.   The MOU does not establish undue hardship because accommodating Groff violated no other employee's seniority rights...........................................39

        2.   USPS fails to offer concrete proof that accommodating Groff would cause material economic or non-economic costs to the conduct of its business. ..................................................45

    B.   *Hardison*'s more-than-*de-minimis* standard contravenes statutory text and conflicts with other civil rights laws............50

Conclusion ........................................................................................52

Combined Certifications .........................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abramson v. William Paterson Coll. of N.J.*,
  260 F.3d 265 (3d Cir. 2001) ...............................................................17

*Ansonia Bd. of Educ. v. Philbrook*,
  479 U.S. 60 (1986)...................................................20, 23, 28, 29

*Antoine v. First Student, Inc.*,
  713 F.3d 824 (5th Cir. 2013) ...............................................................42

*Aron v. Quest Diagnostics, Inc.*,
  2005 WL 1541060 (D.N.J. June 30, 2005), *aff'd*, 174 F. App'x 82
  (3d Cir. 2006)....................................................................................49

*Baker v. The Home Depot*,
  445 F.3d 541 (2d Cir. 2006) ...............................................22, 25, 32

*Brener v. Diagnostic Center Hospital*,
  671 F.2d 141 (5th Cir. 1982) ...............................................................36

*Brown v. Polk Cnty.*,
  61 F.3d 650 (8th Cir. 1995) ...............................................................45

*Bruff v. N. Miss. Health Servs., Inc.*,
  244 F.3d 495 (5th Cir. 2001) ...............................................................26

*Bruni v. City of Pittsburgh*,
  941 F.3d 73 (3d Cir. 2019) ...............................................................15

*Cooper v. Oak Rubber Co.*,
  15 F.3d 1375 (6th Cir. 1994) ...............................................26, 32, 33, 35

*Cosme v. Henderson*,
  287 F.3d 152 (2d Cir. 2002) ...............................................................22

*Crider v. Univ. of Tenn., Knoxville*,
  492 F. App'x 609 (6th Cir. 2012)...............................................34, 48, 49

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
  575 U.S. 768 (2015)......................................................................21, 25, 29, 49, 52

*EEOC v. Arlington Transit Mix, Inc.*,
  957 F.2d 219 (6th Cir. 1991) ............................................................36, 37

*EEOC v. Firestone Fibers & Textiles Co.*,
  515 F.3d 307 (4th Cir. 2008) .......................................26, 27, 28, 29, 45

*EEOC v. GEO Grp., Inc.*,
  616 F.3d 265 (3d Cir. 2010) ................................. 18, 25, 30, 31, 38, 39

*EEOC v. Ilona of Hungary, Inc.*,
  108 F.3d 1569 (7th Cir. 1997) ...........................................................26, 31

*EEOC v. Universal Mfg. Corp.*,
  914 F.2d 71 (5th Cir. 1990) ................................................................22

*Emporium Capwell Co. v. W. Addition Cmty. Org.*,
  420 U.S. 50 (1975) .............................................................................43

*Fouche v. NJ Transit*,
  470 F. App'x 96 (3d Cir. 2012) .........................................................42

*Harrell v. Donahue*,
  638 F.3d 975 (8th Cir. 2011) .............................................................48

*Kennedy v. Bremerton Sch. Dist.*,
  139 S. Ct. 634 (2019).........................................................................51

*Khan v. Att'y Gen. of U.S.*,
  979 F.3d 193 (3d Cir. 2020) .............................................................19

*Komis v. Sec'y of U.S. Dep't of Labor*,
  918 F.3d 289 (3d Cir. 2019) ........................................................16, 17

*Lawrence v. City of Phila.*,
  527 F.3d 299 (3d Cir. 2008) .............................................................16

*M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*,
  969 F.3d 120 (3d Cir. 2020) ........................................................15, 16

*Mann v. Frank*,
   7 F.3d 1365 (8th Cir. 1993) ............................................................43

*McGowan v. Maryland*,
   366 U.S. 420 (1961).........................................................................2

*Miller v. Bolger*,
   802 F.2d 660 (3d Cir. 1986) ..............................................18, 35, 49

*Miller v. Port Auth. of N.Y. & N.J.*,
   351 F. Supp. 3d 762 (D.N.J. 2018), *aff'd*, 788 F. App'x 886 (3d
   Cir. 2019) ..............................................................................34, 35, 49

*Morrissette-Brown v. Mobile Infirmary Medical Center*,
   506 F.3d 1317 (11th Cir. 2007) ......................................................36

*MRL Dev. I, LLC v. Whitecap Inv. Corp.*,
   823 F.3d 195 (3d Cir. 2016) ...........................................................24

*Opuku-Boateng v. California*,
   95 F.3d 1461 (9th Cir. 1996) ....................................................26, 42

*Patterson v. Walgreen Co.*,
   140 S. Ct. 685 (2020)...................................................................50, 51

*Protos v. Volkswagen of Am., Inc.*,
   797 F.2d 129 (3d Cir. 1986) ...........................................................30

*Sanchez-Rodriguez v. AT & T Mobility Puerto Rico, Inc.*,
   673 F.3d 1 (1st Cir. 2012)................................................................26

*Shelton v. Univ. of Med. & Dentistry of N.J.*,
   223 F.3d 220 (3d Cir. 2000) ...........................................................25

*Small v. Memphis Light, Gas & Water*,
   141 S. Ct. 1227 (2021)................................................................50, 51

*Smith v. Pyro Mining Co.*,
   827 F.2d 1081 (6th Cir. 1987) ........................................................45

*Sturgill v. United Parcel Serv., Inc.*,
   512 F.3d 1024 (8th Cir. 2008) ........................................................26

*Tabura v. Kellogg USA*,
   880 F.3d 544 (10th Cir. 2018) ...................................................26, 29

*Toledo v. Nobel-Sysco, Inc.*,
   892 F.2d 1481 (10th Cir. 1989) ..........................................45

*Tooley v. Martin-Marietta Corp.*,
   648 F.2d 1239 (9th Cir. 1981) ...................................................45, 46

*Trans World Airlines, Inc. v. Hardison*,
   432 U.S. 63 (1977)........................ 17, 38, 39, 40, 41, 42, 43, 44, 48, 50, 51, 52

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ...................................................24, 28

*United States v. Husmann*,
   765 F.3d 169 (3d Cir. 2014) ..............................................19

*US Airways, Inc. v. Barnett*,
   535 U.S. 391 (2002)....................................................21, 22, 27, 42

*Virts v. Consol. Freightways Corp. of Del.*,
   285 F.3d 508 (6th Cir. 2002) ..............................................42

*Walden v. Ctrs. for Disease Control & Prevention*,
   669 F.3d 1277 (11th Cir. 2012) ......................................26

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018)........................................................21

## STATUTES

42 U.S.C. § 2000e(b) ..............................................16

42 U.S.C. § 2000e(j) ..............................................11, 17, 20, 23, 48

42 U.S.C. § 2000e-2(a)(1)..........................................16, 17

42 U.S.C. § 2000e-2(c)(3)..........................................43

42 U.S.C. § 2000e-2(h) ...........................................41

42 U.S.C. § 2000e-16(a) ..........................................17, 18

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 7, cl. 2 .......................................................................2

**OTHER AUTHORITIES**

*Accommodate*, The Random House Dictionary of the English
  Language (1968) ...............................................................................20

*Accommodate*, The Shorter Oxford English Dictionary (1973) .............................20

*Accommodate*, Webster's Seventh New Collegiate Dictionary (1971)..................20

Compliance Manual on Religious Discrimination,
  § 12-IV(A)(3) (2021)
  (https://www.eeoc.gov/laws/guidance/section-12-religious-
  discrimination) .................................................................................24

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over the claims arising under Title VII of the Civil Rights Act of 1964 ("Title VII") under 28 U.S.C. § 1331.

On April 6, 2021, the district court granted summary judgment and entered final judgment in favor of Defendant. JA 4. Plaintiff timely filed a notice of appeal on May 5, 2021. JA 1. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether an employer's proposed accommodation that fails to eliminate the conflict with the employee's religious beliefs can be a reasonable accommodation under Title VII.

2.    Whether, under existing case law, the U.S. Postal Service ("USPS") established that granting a religious accommodation allowing Groff to refrain from working on Sundays would cause an undue hardship to the conduct of USPS's business where (a) accommodating Groff would not violate any employee's seniority rights under the collective bargaining agreement and (b) USPS successfully accommodated Groff without undue hardship but then discontinued that practice.

3.    Whether an undue hardship is anything imposing more than a *de minimis* cost on an employer.

1

**INTRODUCTION**

This case raises a simple question: Can an employer satisfy its obligation under Title VII to reasonably accommodate its employee's religious practices if it offers a proposal that fails to eliminate the conflict between work requirements and religious beliefs? This important question has divided the courts of appeals, and this Court has not yet considered it. The answer carries significant consequences, for it will decide whether Title VII allows employees in this Circuit to satisfy both their work duties and religious obligations.

Gerald Groff believes it is his obligation to "[r]emember the Sabbath day, to keep it holy" and to follow the commandment "[s]ix days you shall labor, and do all your work, but the seventh day is a Sabbath to the LORD your God." Exodus 20:8–10 (ESV). American law and culture have long respected the idea of taking a day of rest from work. *See McGowan v. Maryland*, 366 U.S. 420, 431–40 (1961) (describing religious and secular origins and justifications for Sunday closing laws). The Constitution itself reflects the Sunday Sabbath, granting the President "ten Days (Sundays excepted)" in which to decide whether to sign or veto a bill. U.S. Const. art. I, § 7, cl. 2. But when a conflict arose between Groff's duties as a mail carrier for USPS and his observance of the Sunday Sabbath, USPS offered only proposals that would still require Groff to work on Sundays and thereby violate his conscience.

The district court nevertheless granted summary judgment to USPS, holding that an accommodation under Title VII need not actually resolve the conflict between work and religion. In doing so, the district court adopted a reading of Title VII that conflicts with both statutory text and Equal Employment Opportunity Commission ("EEOC") guidance and diminishes the guarantees secured for employees by Title VII. The district court held in the alternative that granting Groff an exemption from Sunday deliveries would have imposed an "undue hardship" on USPS by deviating from the terms of a collective bargaining agreement ("CBA") and adversely affecting Groff's co-workers. This holding misapplies Supreme Court precedent and contravenes USPS's contemporaneous admissions that accommodating Groff would *not* burden its business.

The district court erred not only in granting summary judgment to USPS on Groff's failure-to-accommodate claim but also in refusing to grant summary judgment to Groff. Accordingly, this Court should reverse the district court's decision and direct entry of summary judgment for Groff.

## STATEMENT OF THE CASE

### I. USPS's rollout of Sunday deliveries for Amazon creates a conflict between work and religion for Groff.

Groff began his employment with USPS in 2012 at the Quarryville Post Office in Lancaster County, Pennsylvania, where he eventually became a Rural Carrier Associate ("RCA"). JA 527 ¶ 3, 542. As an RCA, Groff was an entry-level "non-

career" employee, responsible to cover for the work of any Rural Route Carrier—a "career" employee—in the delivery of mails and parcels. JA 527–28 ¶¶ 5–6. RCAs work part-time, and hours vary depending on the office and route. JA 34 ¶ 15, 727 ¶ 15. RCAs are not guaranteed specific hours or set schedules; rather, they are scheduled on an as-needed basis. JA 34 ¶ 17, 727 ¶ 17. RCAs have no contractual right to specific days off, JA 532 ¶ 45, and they generally do not earn "leave" or time off, JA 34 ¶ 17, 727 ¶ 17.

In 2013, USPS signed a contract to deliver packages for Amazon.com, Inc. ("Amazon"), including on Sundays. JA 34 ¶¶ 19–20, 727 ¶¶ 19–20. As an Evangelical Christian within the Protestant tradition, JA 527 ¶ 2, Groff observes Sunday as the Sabbath, JA 539–40. Groff sincerely believes he is obligated to refrain from work on the Sunday Sabbath, including his USPS work responsibilities. *Id*. When the Quarryville station began delivering Amazon packages on Sunday in 2015, JA 35 ¶ 26, 728 ¶ 26, Groff negotiated with his then-postmaster, Patricia Wright, to receive an exemption from working on Sundays, JA 35 ¶ 28, 728 ¶ 28. Postmaster Wright granted his request on condition that Groff provide additional shifts, whenever necessary, on other days of the week. JA 548–51. This arrangement worked to everyone's satisfaction until Summer 2016. JA 590.

On May 24, 2016, USPS and the National Rural Letter Carriers Association ("Union") entered a Memorandum of Understanding ("MOU"), which established

the process for scheduling employees for Sunday Amazon delivery.  JA 528 ¶ 8.

The MOU requires USPS to maintain two lists of part-time flexible carriers.  JA 528

¶ 9.  First, the Union creates a list of all part-time flexible rural carriers, substitute

carriers, RCAs, and rural carrier relief employees.  *Id.*  Second, every employee is

asked if he or she wants to work on Sundays and holidays.  *Id.*  Third, two lists are

created: one of employees who volunteer to work on Sundays and holidays; and one

of employees who do not.  *Id.*

For any given Sunday or holiday, USPS management determines how many

carriers are necessary given the expected mail volume.  JA 528 ¶ 10.  Under the

MOU, management then assigns carriers as follows: First, management schedules

assistant rural carriers ("ARCs").  *Id.*  If there are sufficient ARCs, no additional

part-time flexible carriers are scheduled.  *Id.*  If there are insufficient ARCs,

management then schedules additional carriers from the volunteer list, on a rotating

basis.  *Id.*  If there are insufficient carriers between the ARCs and volunteers,

additional part-time flexible carriers such as RCAs are scheduled, on a rotating basis,

from the non-volunteer list.  *Id.*  The MOU provides that a part-time flexible carrier

may be bypassed in the rotation if the part-time flexible carrier has approved leave

or a non-scheduled day adjacent to the Sunday or holiday, or if scheduling the part-

time flexible carrier to work on the Sunday or holiday would result in the carrier

exceeding 40 hours at the end of the work week.  JA 528 ¶ 11.  In addition, RCAs

covering the extended vacancy of full-time career carriers are only scheduled if all other part-time flexible carriers have been scheduled and more carriers are still needed. *Id.* Thus, the scheduling procedures in the MOU generally called for RCAs to be available for Sunday Amazon deliveries. JA 528–29 ¶¶ 9–11. But no RCA had a superior right to have Sunday off than another RCA, JA 533 ¶ 48, and RCAs were scheduled for Sunday deliveries without regard to their seniority, JA 533 ¶ 47.

In Summer 2016, Quarryville Postmaster Wright informed Groff that she would no longer grant him an exemption from Sunday deliveries, telling him that he would need to work on Sundays or find another job. JA 551. To avoid a conflict between work and faith, Groff requested a transfer to the Holtwood station, which was not yet delivering Amazon packages on Sundays. JA 529 ¶¶ 14–15. Brian Hess, Groff's postmaster at Holtwood, knew Groff transferred to avoid Sunday deliveries due to his observance of the Sunday Sabbath. JA 529 ¶ 14. From the time of his transfer through March 2017, Groff got along well with Postmaster Hess and the other employees at the station, and he was never disciplined. JA 529 ¶ 17.

The Holtwood Post Office began Sunday Amazon deliveries on March 19, 2017. JA 529 ¶ 18. Groff was scheduled for that day. JA 529 ¶ 16. However, from that day until Groff's employment with USPS ended on January 18, 2019, he never worked on a Sunday, honoring his convictions about the Sunday Sabbath. JA 530 ¶ 21. Management offered Groff three options to address the conflict between his

faith and his employment obligations.  JA 530 ¶ 22.  First, if he was scheduled on a Sunday, he could take another day that week entirely off from work as a day of worship.  *Id*.  Second, if he was scheduled on a Sunday, he could report to work by 12:00 p.m. after the conclusion of church services.  *Id*.; JA 575.  Third, management would contact other stations to attempt to find coverage for Groff when he was scheduled on Sunday.  JA 530 ¶ 22.  If coverage was found, Groff would be excused. *Id*.[1] Unfortunately, these options did not eliminate the requirement for Groff to work on some Sundays and thus did not resolve the conflict with Groff's religious beliefs.

While the first two options plainly did not respect Groff's Sunday Sabbath beliefs, USPS's attempt to find RCAs willing to swap shifts with Groff requires further factual background.  When implementing the Amazon contract in the Central Pennsylvania District, USPS distinguished between "peak" and "non-peak" seasons for Sunday deliveries.  JA 532 ¶ 42.  The "peak" season was generally defined as the Sunday before Thanksgiving until the first or second week of the new year.  *Id*.

---

[1] Before the district court, USPS argued in its Motion for Summary Judgment that management offered Groff a fourth option: "Fourth, within reason, the plaintiff could find his own coverage for when he was scheduled.  If coverage was found, the plaintiff would be excused from working on that particular Sunday."  Dkt. No. 36 at 5 (citations omitted); *see also* JA 37 ¶ 43.  Subsequently, USPS acknowledged that "[t]he plaintiff disputes that the USPS also allowed him to find volunteers himself" and further claimed that "[t]his dispute is irrelevant, as this accommodation was functionally equivalent to the third accommodation he agrees that he was offered." Dkt. No. 42 at 3 n.3; *see* JA 621–22 (Postmaster Hess affirming that it was management's responsibility to find substitutes for Groff).

During peak season, all Amazon deliveries were handled in each respective post office, using its own staff and without the Lancaster County Annex in Lancaster City. JA 532 ¶ 44. During non-peak season, all RCAs in Lancaster County had to report for Sunday and holiday deliveries at the Lancaster County Annex. JA 532 ¶ 43. The Annex Supervisors were in charge of scheduling RCAs for non-peak Sunday delivery. JA 533 ¶ 49.

USPS's shift-swapping efforts for Groff were, in Hess's words, "kind of arbitrary." JA 457. Hess or other supervisors were not always able to locate another RCA to volunteer for Groff's Sunday shifts. JA 533 ¶¶ 51–52, 612. For a time, however, Groff's Annex Supervisors effectively accommodated Groff by skipping over Groff on the Sunday schedule or scheduling in advance an extra RCA on Sundays for which Groff was scheduled. JA 623, 628. When Hess learned of these practices, he sent an email on July 31, 2018, clarifying the proper procedures for accommodating Groff. JA 684. Hess explained that Groff could be disciplined only if "every effort was made to seek a volunteer and that [his] refusing to work is causing an undue hardship/burden on the USPS." *Id*. He explained that automatically scheduling an extra RCA to cover Groff's Sunday route "satisfies his religious accommodation request for Sundays and no disciplinary action is needed." *Id*. But doing so meant that finding a volunteer RCA was not needed, and therefore, it posed no undue hardship to USPS. *Id*. Labor Relations Manager Lyle Gaines

8

responded that "[w]e only have an obligation to solicit for volunteers. If there are none then he has to work. . . . You are not required to overschedule non volunteers to accommodate." *Id*. After this email exchange, USPS ended the process of skipping over Groff or automatically scheduling an extra RCA in his place. JA 623.

## II.    USPS disciplines Groff for abiding by his sincerely held religious beliefs.

Groff was scheduled but did not report for work on at least 24 Sundays between March 2017 and May 2018, JA 530 ¶ 23, and he missed additional Sundays through the end of his employment with USPS, JA 532 ¶¶ 36, 39. Hess notified Groff that USPS, after conducting a Performance Discipline Interview ("PDI"), could progressively impose discipline for refusing to work Sundays, beginning with a warning, then suspensions, and then termination. JA 530 ¶ 25, 569, 633. In total, USPS held eight PDIs with Groff and imposed progressive discipline, first issuing a Written Letter of Warning on June 9, 2017; a 7-day paper suspension on January 2, 2018; and then a 14-day paper suspension on October 5, 2018. JA 531 ¶ 28. Aside from Sunday attendance, Groff was an exemplary RCA. JA 531 ¶ 29.

In Groff's first PDI with Station Master Aaron Zehring in April 2017, Zehring suggested Groff pick a different day of the week to observe the Sabbath, JA 531 ¶¶ 30–31, or report to work on Sunday after attending church, JA 575, 667. Groff explained to Zehring that these proposals prevented him from observing Sunday as the Sabbath. JA 667. Taking a different day of the week as a Sabbath prevented

him from worshipping with his fellow believers at church and spending time in fellowship with friends and family, vital aspects of Groff's Christian faith. *Id*. And coming in after church to work prevented Groff from keeping the whole of Sunday as a day of rest and worship. *Id*. Groff felt that Zehring was asking him to change his religious beliefs to keep working at USPS. *Id*. In fact, after additional PDIs, Hess questioned Groff as to whether he was making the right decision and implored Groff to consult his pastor on whether it was necessary for him to abstain from Sunday work. JA 668–69. Groff refused to be deterred from adhering to his religious convictions and explained to Hess that when faced with a conflict between earthly authority and God's commandments, he must always choose to honor God. JA 669.

After several more PDIs and additional discipline, Groff reiterated his request for accommodation and sought transfer to another position that did not require Sunday work. JA 612. Groff was told no such non-career positions existed. JA 532 ¶ 40, 612. Responding to the accommodation request, USPS offered to find volunteers for Groff's Sunday assignments, or, alternatively, allow him to take off another workday or report after church on Sunday. JA 686.

Hess held an eighth PDI with Groff on September 6, 2018, and issued a 14-day paper suspension on October 5, 2018. JA 531–32 ¶¶ 35–36. Groff continued to have additional Sunday absences. JA 532 ¶ 39. Knowing termination was the next

form of discipline and transferring to another facility was futile, Groff tendered his resignation on January 18, 2019. JA 532 ¶ 38. Forced by USPS to choose between his faith and his job, Groff chose his faith.

### III. Groff files a Title VII action, and the district court grants summary judgment to USPS.

On May 1, 2019, Groff initiated this action against the Postmaster General. JA 746 Dkt. No. 1. Groff asserted that USPS failed to accommodate his religious belief in violation of Title VII's requirement that employers must reasonably accommodate the religious exercise of employees unless doing so would impose an undue hardship on the employer. Dkt. No. 7 ¶¶ 57–66; 42 U.S.C. § 2000e(j).[2]

On April 6, 2021, the district court granted USPS's motion for summary judgment, denied Groff's, and entered judgment in favor of USPS. JA 751 Dkt. Nos. 54–55. The district court observed that federal circuits disagree over whether an accommodation must eliminate, or merely curtail, the conflict between work and religion. JA 25. Lacking on-point authority from the Third Circuit, the district court concluded that "an employer does not need to wholly eliminate a conflict in order to offer an employee a reasonable accommodation." *Id*. Because management attempted to provide shift swaps, USPS offered a reasonable accommodation to

---

[2] Groff also claimed disparate treatment on account of religion, and the district court granted summary judgment for USPS on that claim. He no longer pursues that claim on appeal.

Groff that lessened the religious conflict. JA 26. In addition, the district court held

that exempting Groff from Sunday deliveries would cause undue hardship to USPS

because it would violate the MOU and cause more than a *de minimis* impact on his

co-workers. JA 30. Groff timely appealed. JA 1.

## SUMMARY OF ARGUMENT

Title VII required USPS to provide Groff a reasonable accommodation for his

observance of the Sunday Sabbath, unless doing so would impose an undue hardship

on USPS. In holding that a reasonable accommodation need not eliminate the

conflict between work and religion, the district court embraced the wrong side of a

circuit split that this Court has not yet considered. Properly understood, Title VII

requires that an accommodation eliminate the conflict between work and religion.

This conclusion flows from the plain meaning of the word "accommodate," which

conveys the need for effectiveness. A proposed "accommodation" that leaves the

religious conflict festering is no accommodation at all. The modifier "reasonably"

in Title VII does not allow an ineffective accommodation but instead clarifies that

when adopting an accommodation, the employer has discretion to select among

reasonable options that effectively resolve the work-religion conflict. Moreover, the

availability of an "undue hardship" defense signals that the employer's burden does

not dilute what counts as a reasonable accommodation; instead, the employer may

prevail if it shows that a conflict-resolving accommodation would impose an undue

hardship.  The requirement that an accommodation eliminate the religious conflict is consistent with EEOC's longstanding interpretation of Title VII.

Five circuits have adopted the conflict-elimination standard in defining reasonable accommodation while five other circuits have concluded that a reasonable accommodation need not in fact resolve the religious conflict.  This "reasonableness without accommodation" standard fails to give independent meanings to the words "accommodate," "reasonably," and "undue hardship," disrupts the balance of interests between employer and employee, and conflicts with how the Supreme Court has characterized an employer's Title VII duties.  This Court should adopt the elimination standard.

None of the accommodations offered by USPS eliminated the conflict between Groff's work obligations and religious beliefs.  USPS's proposal that Groff take a different day off from work plainly did not eliminate the conflict.  An employer's proposal may not rewrite or redefine the employee's religious practices.  USPS's suggestion that Groff come to work after attending church services fails for similar reasons.  Asking Groff to rest only part of Sunday prevented him from fully practicing his observance of the Sunday Sabbath.  Lastly, USPS's attempt to find shift swaps for Groff is likewise defective.  This policy merely reduced the number of days on which USPS asked Groff to violate his religious beliefs, while still leaving him assigned at least 24 Sundays over a less-than-two-year period.  To be sure, an

employer has leeway when formulating the details of a shift-swapping policy, but it must actually resolve the religious conflict to qualify as an accommodation. Because USPS failed to offer an accommodation that eliminated the conflict between Groff's work duties and religious beliefs, the district court erred in granting summary judgment to USPS on Groff's failure-to-accommodate claim.

The district court also erroneously concluded that accommodating Groff would pose an undue hardship in light of the MOU's provisions regarding Sunday assignments and the effect on Groff's co-workers. First, neither the Supreme Court nor this Court has held that merely deviating from the terms of an employer's agreement with a union constitutes undue hardship. Instead, courts have narrowly held that an employer need not offer an accommodation where doing so would conflict with the seniority rights of other employees. That is because seniority policies are expressly exempted from Title VII. Here, Groff and USPS agree that RCAs have no seniority rights. To adopt the broader rule endorsed by the district court would permit employers and unions to contract away an employee's right to a workplace free from religious discrimination.

Second, this is not a case where USPS could not accommodate Groff. Instead, USPS successfully accommodated Groff without undue hardship and then changed its practices. Postmaster Hess candidly acknowledged in a contemporaneous email that USPS's practice of granting an exemption to Groff and automatically scheduling

an extra RCA in his place "does not show a hardship/burden to the USPS." JA 684.

Likewise, USPS's corporate representative could not identify any costs incurred by

USPS when skipping over Groff.    At most, Groff's co-workers would be affected

when Groff was exempted from Sunday deliveries.  But Title VII does not exempt

accommodations merely because they affect *co-workers*, and USPS could not show

how the alleged impact on co-workers impeded *its business operations*.  Whatever

costs USPS may have incurred resulted from continuing to schedule Groff to deliver

on Sundays and then having to find replacements, rather than adopting other readily

available approaches to accommodate him (like scheduling an extra RCA in place

of Groff).

Accordingly, this Court should reverse the decision below and grant summary

judgment to Groff on the failure-to-accommodate claim.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant or denial of summary judgment

de novo." *Bruni v. City of Pittsburgh*, 941 F.3d 73, 82 (3d Cir. 2019).  "Summary

judgment is appropriate only where 'there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed.

R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome

of the case under governing law.  And a factual dispute is genuine if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *M.S. by*

*& through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citations and internal quotation marks omitted). The evidence is viewed in the light most favorable to the non-moving party. *Id.* Summary judgment rules apply with equal force to cross-motions for summary judgment. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

## ARGUMENT

### I. Title VII requires USPS to provide Groff with a religious accommodation.

Title VII makes it unlawful for employers in both the public and private sector to discriminate against employees on the basis of race, color, religion, sex, or national origin. Failure to accommodate an employee's religious beliefs is one form of religious discrimination.

Considered the "core antidiscrimination provision" of Title VII, *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019), § 703(a) provides that in the private sector:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1) (emphasis added); *see also id.* § 2000e(b) (excluding the "United States" from Title VII's definition of an employer); *Komis*, 918 F.3d at 292

(provision is limited to "the private sector"). Employees may assert two different theories of religious discrimination: disparate treatment and failure to accommodate. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001). Title VII defines religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). An employer may avoid liability if it demonstrates that it cannot "reasonably accommodate" the employee's religious observance or practice "without undue hardship on the conduct of the employer's business." *Id.* "The intent and effect of this [provision] was to make it an unlawful employment practice under [42 U.S.C. § 2000e-2(a)(1)] for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

"In 1972, Congress extended Title VII's protections to federal employees in § 2000e-16(a)." *Komis*, 918 F.3d at 294 (citing Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 11, 86 Stat. 103, 111 (1972)). This section of Title VII generally provides that all personnel actions affecting federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Thus, "Congress intended to provide federal employees with the full rights available in the courts as are granted to individuals in the private sector under Title VII." *Komis*, 918 F.3d at 294. The act specifically

confers this protection on employees "in the United States Postal Service."  42 U.S.C. § 2000e-16(a); *Miller v. Bolger*, 802 F.2d 660 (3d Cir. 1986).

As a federal employee with USPS, Groff was protected by Title VII from discrimination based on his religious beliefs and practices, and USPS was obligated to provide an accommodation for his religious exercise.

## II.    The district court erroneously concluded that USPS offered Groff reasonable accommodations.

USPS conceded below that Groff established a *prima facie* claim for failure to accommodate.  JA 24; Dkt. No. 42 at 2; *see EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010) (setting forth burden-shifting framework for religious-accommodation claim).  "The burden then shifts to the employer" to show either that it reasonably accommodated the religious belief or that such an accommodation would work an undue hardship upon the employer and its business. *GEO Grp.*, 616 F.3d at 271.  USPS cannot establish either defense.

The district court mistakenly concluded that USPS offered Groff a reasonable accommodation.  To reach this ruling, the district court held that an employer's accommodation need not eliminate the conflict between work and religion.  This holding implicates a recognized disagreement among the circuits regarding whether a proposed accommodation must eliminate, rather than merely curtail, the conflict between a job's work requirements and the employee's religious observances.  Text, context, interpretive precedent, and EEOC guidance all counsel this Court to hold

18

that an accommodation under Title VII must eliminate the conflict between work and religion.[3]    Under this standard, it is undisputed that none of the "accommodations" offered by USPS eliminated the conflict between Sunday deliveries and Groff's observance of the Sunday Sabbath.

## A.    An accommodation must eliminate the conflict between employment obligations and religious practice.

"As with any question of statutory interpretation, we must begin with the statutory text, and because we presume that Congress expressed its intent through the ordinary meaning of its language, we start with an examination of the plain language of the statute." *Khan v. Att'y Gen. of U.S.*, 979 F.3d 193, 197–98 (3d Cir. 2020) (cleaned up).  "In particular, courts normally interpret a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Id.* (cleaned up).  Accordingly, this Court "look[s] to dictionary definitions to determine the ordinary meaning of a word" while understanding that "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014) (citations and internal quotation marks omitted).

---

[3] As the district court noted, this Court has not squarely addressed this question, JA 25, but as discussed below, this Court's decisions weigh strongly in favor of Groff.

**1.    Title VII's text requires a proposed accommodation that eliminates the religious conflict.**

The operative provision of Title VII requires an employer to "reasonably accommodate" an employee's religious observance or practice.    42 U.S.C. § 2000e(j).  To "accommodate" means "to bring into agreement or concord" or to "reconcile." *Accommodate*, Webster's Seventh New Collegiate Dictionary (1971); *see also Accommodate*, The Shorter Oxford English Dictionary (1973) ("To adjust, reconcile (things or persons); to bring to agreement"); *Accommodate*, The Random House Dictionary of the English Language (1968) ("to bring into harmony; adjust; reconcile" as in "to accommodate differences").  The plain meaning of the word accommodate accords with how the Supreme Court has construed the term: "an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business."  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (citation and internal quotation marks omitted).  In *Ansonia,* a high school teacher requested six religious holidays each year, but the school permitted only three days of paid leave to be used for religious observance. *Id.* at 63. The Court approved one of the proposed accommodations—unpaid leave for the remaining three days—because it "*eliminate*[*d*] the conflict between employment requirements and religious practices by allowing the individual *to observe fully religious holy days* and requires him only to give up compensation for a day that he did not in fact work." *Id.* at 70 (emphases added).

Interpreting the similar Americans with Disabilities Act, the Supreme Court has emphasized that the word "accommodate" "conveys the need for effectiveness," for "[a]n *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002). The Court recently confirmed this definition in the Title VII context, stating that accommodation "means nothing more than allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 n.2 (2015). This effective-accommodation reading is required because "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers" to provide an accommodation. *Id*. at 775. A proposed accommodation that does not "allow[] the plaintiff to engage in her religious practice" is not an accommodation at all. *See id.* at 772 n.2. Such a proposal would not effectively reconcile the employee's religious practices with his employment obligations and thus fails the plain meaning of the word accommodation.

The modifier "reasonably" in Title VII cannot possibly weaken the *baseline* requirement for an "accommodation"—that it eliminate the conflict with the employee's religious practices. *Cf. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) ("According to the ordinary understanding of how

adjectives work, 'critical habitat' must also be 'habitat.' Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality.").  Indeed, in *Barnett*, the Supreme Court rejected the view that "reasonable accommodation" simply means "effective accommodation." *Barnett*, 535 U.S. at 400.  "Reasonable" does not convey the level of effectiveness required; the need for effectiveness comes directly from the word "accommodate." *Id*.  Thus, an ineffective accommodation can never be a "reasonable accommodation." *Id*.  The reasonableness requirement simply means that when adopting an accommodation, the employer possesses discretion to reasonably select among effective resolutions of the work-religion conflict. *See id*.  Circuit courts echo this principle.  "[T]he employer need not offer the accommodation the employee prefers." *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002).  Nor are employees "entitled to hold out for the 'most beneficial accommodation.'" *Baker v. The Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006) (citation omitted).

Reasonableness thus defines the outer bounds of an employer's discretion to select among effective accommodations that resolve the religious conflict.  "[A]n offer of accommodation may be unreasonable if it causes an employee to suffer an inexplicable diminution in his employee status or benefits.  In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification." *Id.* (cleaned up); *see also EEOC v.*

*Universal Mfg. Corp.*, 914 F.2d 71, 73 n.3 (5th Cir. 1990) ("Reasonableness seems to focus more upon the cost to the employer, the extent of positive involvement which the employer must exercise, and the existence of overt discrimination by the employer."). This interpretation illustrates the principle of "bilateral cooperation" that should guide "the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia*, 479 U.S. at 69.

The availability of the "undue hardship" defense to employers provides context for understanding the meaning of "reasonable accommodation." 42 U.S.C. § 2000e(j) (excusing employer from offering a reasonable accommodation if doing so would cause the employer to suffer "undue hardship on the conduct of the employer's business"). That defense reflects the reality that eliminating the religious conflict may sometimes be unduly burdensome to the employer. But the employer's burdens are assessed under the hardship defense, not used to dilute the front-line requirement that employers provide an accommodation that effectively eliminates the religious conflict. The statute thus balances a robust, initial requirement that employers allow employees to fully practice their religious beliefs, with a backstop provision that relieves the employer's obligation to provide such an accommodation if it would be unduly burdensome. By countenancing something less than a true "accommodation," the district court's approach conflates the two

prongs of the statute and disrupts the full protections presumptively accorded to employees.

Construing the three key statutory phrases as a whole, Title VII requires an employer to provide an accommodation that fully eliminates the conflict between an employee's religious observances and work obligations.  The employee need not offer any particular accommodation, but the accommodation must, by definition, be an effective one.  If this obligation imposes too onerous a burden on the employer, the employer is excused.  This reading "is consistent with this Court's preference to construe a statute in a way that gives meaning to all provisions." *MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 205 (3d Cir. 2016); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (citation omitted).  It is also consistent with EEOC's longstanding interpretation of Title VII: "An adjustment offered by an employer is not a 'reasonable' accommodation if it merely lessens rather than eliminates the conflict between religion and work, provided that eliminating the conflict would not impose an undue hardship."  Compliance Manual on Religious Discrimination § 12-IV(A)(3)    (2021)    (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination).

Last but not least, this interpretation is consistent with this Court's laser focus on whether proposed accommodations truly eliminate the religious conflict. In *GEO Group*, the employer proposed that Muslim employees be allowed to wear a different head covering than the khimar required for Muslim women. 616 F.3d at 271. Refusing "to delve into any matters of theology," the Court "decline[d] [the employer's] invitation to decide on [the Court's] own what might constitute a reasonable substitute for a khimar under the Islamic faith" and thereby deferred to the employees' view that the accommodation did not suffice to protect their religious beliefs. *Id*. Moving to the undue-hardship defense, the Court concluded that the employer established that allowing the khimar would disrupt its business operations. *Id*. at 271–77. The Court's approach rightly embraces the need for an accommodation that eliminates the religious conflict—as understood by the employee—balanced by an employer's opportunity to show that the accommodation would work an undue hardship. *See also Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 226 (3d Cir. 2000) (upholding an accommodation in which plaintiff "ha[d] not established she would face a religious conflict").

### 2. The district court's approach conflicts with Title VII's text and *Abercrombie*.

Five circuits have correctly interpreted Title VII to require an accommodation that eliminates the conflict between work and religion. *See, e.g.*, *Baker*, 445 F.3d at 548 ("Simply put, the offered accommodation cannot be considered reasonable

because it does not eliminate the conflict between the employment requirement and the religious practice.") (cleaned up); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) ("If the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's beliefs without incurring undue hardship."); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997) ("The offered accommodation cannot be considered reasonable, however, because it does not eliminate the conflict between the employment requirement and the religious practice."); *Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir. 1996) (employer must "eliminate the religious conflict," or "either accept the employee's proposal or demonstrate that it would cause undue hardship were it to do so"); *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) ("[A] reasonable accommodation is one that eliminates the conflict between employment requirements and religious practices.") (citation and internal quotation marks omitted). Five circuits have concluded that Title VII allows an accommodation that does not eliminate the religious conflict. *See, e.g.*, *Sanchez-Rodriguez v. AT & T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 12 (1st Cir. 2012); *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir. 2008); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001); *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1030–31 (8th Cir. 2008); *Tabura v. Kellogg USA*,

880 F.3d 544, 552 (10th Cir. 2018).  Without analysis, the district court adopted the latter side of the circuit split, declaring that "an employer does not need to wholly eliminate a conflict in order to offer an employee a reasonable accommodation."  JA 25.  Having established the governing test, the court concluded that USPS's proposed accommodations easily met it, even though they required Groff to work on numerous Sundays.  This "reasonableness without accommodation" standard should be rejected.

First, this standard fails to give independent meaning to the words "accommodate" and "reasonably."  Courts adopting this standard surmise that the statute cannot require true accommodation because "accommodate" is modified by the word "reasonably."  *See Firestone*, 515 F.3d at 313.  But this approach elides the separate meaning of the words accommodate and reasonably.  "It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness."  *Barnett*, 535 U.S. at 400.  "Accommodate" specifies the necessary outcome—effective reconciliation of faith and employment obligations. "Reasonably" imports that an employer has options in how to achieve that accommodation.  Overlooking the independent meaning of the two terms turns Title VII from a requirement to "reasonably accommodate" into a general duty of "reasonableness."  If a delivery service pledges to "reasonably deliver" a package, no one would dispute that it has an obligation ensure that the package arrives at its

destination, although it may have discretion as to the manner of delivery.  But under the district court's approach, the delivery service would not be obligated to actually deliver the package; so long as it acts reasonably in its endeavor, it satisfies its duty. The district court's approach substitutes a hazy duty of reasonableness for a bright-line requirement of accommodation that reflects the statutory text and purpose.

Second, an untethered duty of reasonableness erases the distinction between the "reasonably accommodate" and "undue hardship" inquiries.  After all, any proposed accommodation that results in undue hardship "almost certainly would not be" reasonable, making it unnecessary for an employer ever to resort to the undue-hardship defense. *See Firestone*, 515 F.3d at 314.  The Fourth Circuit endorsed this approach while candidly acknowledging that it leads to "much overlap between the two" inquiries and in some instances will collapse them altogether. *Id*. Congress, however, employed distinct terms to convey different meanings for the two separate defenses, with no indication that one should render the other superfluous.  The district court's approach violates cardinal rules of statutory interpretation. *See TRW*, 534 U.S. at 31.

Third, this approach disrupts Title VII's goal of "bilateral cooperation" toward "an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia*, 479 U.S. at 69 (citation and internal quotation marks omitted).  Mandating reasonableness without

accommodation stacks the deck in favor of employers.  It empowers employers to offer something less than true accommodation and largely eliminates employers' need to show that resolving the religious conflict would cause an undue hardship.

Lastly, this approach cannot be reconciled with Supreme Court precedent. Courts that do not require an accommodation to eliminate the religious conflict reason that "in fact, few things in life can be conflict-free," *Tabura*, 880 F.3d at 551–52, and opine that "[Title VII] is not an area for absolutes," *Firestone*, 515 F.3d at 313.  But the Supreme Court has defined "accommodation" in terms of "allowing the plaintiff to engage in her religious practice *despite the employer's normal rules to the contrary*." *Abercrombie*, 575 U.S. at 772 n.2 (emphasis added).  It has recognized that a valid accommodation "*eliminates* the conflict between employment requirements and religious practices by allowing the individual *to observe fully*" their religious precepts.  *Ansonia,* 479 U.S. at 70 (emphases added). In other words, Supreme Court precedent reflects that absolute religious beliefs are given "favored treatment," *Abercrombie*, 575 U.S. at 775, and that Title VII presumptively resolves those conflicts on the side of religion—subject to the undue-hardship defense.

To safeguard the protections guaranteed to employees with sincerely held religious beliefs, this Court should follow the Second, Sixth, Seventh, Ninth, and Eleventh Circuits in holding that an accommodation must eliminate the conflict

between work obligations and religious practice.

**B.    None of the "accommodations" offered by USPS eliminated the conflict between Sunday deliveries and Groff's religious beliefs.**

Applying the proper standard, it is undisputed that none of the accommodations offered by USPS eliminated the conflict between Groff's work obligations and religious beliefs.  Before analyzing whether an accommodation eliminated a work-religion conflict, the employee's religious practice must be properly defined from the employee's perspective.  *See GEO Grp.*, 616 F.3d at 271. Here, Groff observes Sunday as the Sabbath.  JA 539–40.  As part of his observance, it is undisputed that Groff sincerely believes he is obligated to refrain from all work on the Sunday Sabbath, including his USPS work responsibilities.  *Id.*  According to Groff's religious beliefs, it is Sunday, not any other day of the week, that is set aside for rest, and undertaking any work on Sunday conflicts with his observance of the Sunday Sabbath.  *Id.*  As this Court has observed, "[t]o interpret Title VII in [a] fashion" that treats observance of the Sabbath as beyond accommodation "would effectively remove from the statute's protection all employees who subscribe to religions with strict prohibitions against Sabbath labor." *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134 (3d Cir. 1986).  Thus, there can be no doubt that Groff's strict Sabbath observance is a prototypical religious practice for which accommodation is presumptively mandated.  None of USPS's proposals validly accommodated Groff's beliefs.

***Taking off another day of the week.*** USPS informed Groff that if he was scheduled on a Sunday, he could take another day that week off from work as a day of worship. JA 530 ¶ 22. USPS's proposal plainly did not eliminate the conflict between work and religion. An employer's proposal may not rewrite or redefine the employee's religious practices. When two Jewish employees requested Yom Kippur off from work to observe the religious holiday and the employer offered them a different day off to observe the holiday, the Seventh Circuit concluded that this was not a reasonable accommodation "because it does not eliminate the conflict between the employment requirement and the religious practice." *Ilona of Hungary*, 108 F.3d at 1576. For Groff, Sunday—not any other day—is the Sabbath and thus a day of rest. USPS's labor-relations manager acknowledged that failing to excuse Groff from Sunday work would conflict with his religious observances. JA 602. Indeed, as Groff explained to another supervisor, taking a different day of the week as a Sabbath would have precluded him from worshipping with his fellow believers at church and spending time in Christian fellowship with friends and family, vital aspects of Groff's Christian faith. JA 667. USPS's proposed accommodation fares no better than proposing that a Christian employee celebrate Christmas on November 25 or asking that a Muslim employee fast from sundown to dawn during Ramadan. *Cf. GEO Grp.*, 616 F.3d at 291 (Tashima, J., sitting by designation and dissenting) ("Just as it is not reasonable to ask a Christian employee to observe

Christmas in July, it is not reasonable to ask a Muslim woman who must hide her hair to appear in public displaying a full head of hair. . . . It is neither the court's nor the employer's prerogative to dictate to an employee how she should comply with the requirements of her religion."). None of these offers allows the believer to practice his faith. USPS's "accommodation" is like preparing lamb for dinner to "accommodate" a vegetarian. *Cf. My Big Fat Greek Wedding* (Gold Circle Films 2002) ("What do you mean he don't eat no meat? Oh, that's okay, that's okay. I make lamb.").

**Attending church in the morning and working in the afternoon.** USPS's suggestion that Groff come to work after attending Sunday church services also fails to accommodate his religious beliefs. JA 530 ¶ 22, 575. This proposal is no different than the one the Second Circuit rejected in *Baker*. 445 F.3d at 548. There, the employee viewed Sunday as a day of rest and believed that strict observance of the Sabbath was essential to his faith. *Id*. at 543. The employer offered a work schedule that would exclude Sunday mornings, allowing the employee to attend church services. *Id*. at 545. The court explained "the shift change offered to [the employee] was no accommodation at all because, although it would allow him to attend morning church services, it would not permit him to observe his religious requirement to abstain from work *totally* on Sundays." *Id.* at 547–58. The Sixth Circuit reached the same conclusion on similar facts. *Cooper*, 15 F.3d at 1379

(offering employee the option of trading her Saturday day shift for the Friday night shift accommodated employee's attendance of church on Saturday but did not respect employee's belief in abstaining from work from sundown Friday to sundown Saturday).

An accommodation must allow the employee to observe the totality of his religious beliefs. As Groff explained, coming in to work after church prevented Groff from keeping the whole of Sunday as a day of worship and a day of rest, JA 667, a fact that his supervisors acknowledged, JA 602, 612. Treating USPS's proposal as a valid accommodation would mean that an employer could limit a Jewish employee to wearing a yarmulke for only part of the workday or a Muslim employee to praying fewer than five times a day while at work. Just as vegetarian dishes made with dairy products would not satisfy the totality of a vegan's dietary restrictions, USPS's proposal did not accommodate the totality of Groff's observance of the Sunday Sabbath.

***Finding volunteers to take Groff's shifts.*** USPS's offer to find shift swaps for Groff fares no better in eliminating the conflict with Groff's religious beliefs. Management offered to contact other stations to attempt to find coverage for Groff when he was scheduled. JA 530 ¶ 22. If coverage was found, Groff would be excused. *Id*. Under this system, management still scheduled Groff for at least 24 Sundays in a two-year period, JA 530 ¶ 23, and when he missed those days of work,

management disciplined him.  Thus, this policy did nothing more than reduce the number of days in which USPS asked Groff to violate his religious beliefs.  "Although an employee is obligated to cooperate with an employer's attempt at accommodation, cooperation is not synonymous with compromise, where such compromise would be in violation of the employees' religious needs."  *Crider v. Univ. of Tenn., Knoxville*, 492 F. App'x 609, 613 (6th Cir. 2012).  In *Crider*, the employer proposed a shift exchange under which the employee, who objected to working from sundown Friday to sundown Saturday, might still be called to work on Saturdays.  *Id.* at 612.  The Sixth Circuit held that "[o]ffering [the employee] fewer Saturday shifts is not a reasonable accommodation to religious beliefs which *prohibit* working on Saturdays."  *Id.* at 613.  Similarly, offering a shift-swapping program that merely reduced the number of Sunday shifts Groff was obligated to work does not accommodate a belief in abstaining from work on Sundays.  In either case, the employer requires the employee to violate his religious convictions and thereby fails to satisfy the duty to accommodate.

As the district court observed, "voluntary shift swapping *may* be a reasonable accommodation," JA 25–26 (emphasis added), but only if the shift-swapping program actually solves the conflict between work and religion.  "Most obviously, if a shift change or swap does not actually resolve the conflict, then it is not a reasonable accommodation."  *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d

762, 783 (D.N.J. 2018), *aff'd*, 788 F. App'x 886 (3d Cir. 2019).  In *Miller*, the court made clear that "fruitless" shift-swapping arrangements do not offer an accommodation to an employee looking to avoid shifts that cause a religious conflict.  *Id.* at 787.  The employee in *Miller* lost only because he failed to adduce competent evidence that the shift-swapping policies were unsuccessful at accommodating his religious beliefs.  *Id.* at 783, 787.  Groff adduced undisputed evidence that USPS's shift-swapping efforts left him scheduled for at least 24 Sundays and then penalized him when he did not report for work.

In other cases where courts have concluded that a shift-swapping arrangement was a reasonable accommodation, the effectiveness of the accommodation in resolving the religious conflict was not at issue; rather, the courts examined other issues that bore on the reasonableness of the accommodation.  For example, in *Cooper*, the Sixth Circuit considered an employer that supplemented its shift-swapping arrangement by asking the employee to use her accrued vacation days to avoid working on the Sabbath.  15 F.3d at 1379.  The court "recognize[d] that use of vacation time legitimately may be required to allow an employee to avoid work on religious holidays or, in combination with other methods, to allow an employee to regularly avoid working on the Sabbath" but held that "[a]n employer who permits an employee to avoid mandatory Sabbath work only by using accrued vacation does not 'reasonably accommodate' the employee's religious beliefs."  *Id*.  In

*Morrissette-Brown v. Mobile Infirmary Medical Center*, the Eleventh Circuit held

that because the employer provided the master schedule of all employees' shifts, the

employee was able to schedule her own swaps, and the court rejected the notion that

the employer had to "actively assist in coordinating other shift arrangements." 506

F.3d 1317, 1323 (11th Cir. 2007). And in *Brener v. Diagnostic Center Hospital*,

671 F.2d 141 (5th Cir. 1982), the Fifth Circuit confirmed that an employer may

require an employee to arrange her own shifts without any assistance from the

employer, especially when the employee makes no effort to cooperate with the

accommodation effort. *Id.* at 145–46. None of these cases addressed whether the

employer's proposed accommodation would effectively resolve the religious

conflict. Here, by contrast, Groff is not complaining about any logistical burden or

inconvenience imposed on him by USPS's proposed accommodation. Groff's

objection is fundamental: the accommodation, *as proposed by USPS*, forces him to

violate his faith or suffer discipline.

Courts that considered analogous proposed accommodations have concluded

that "a week-to-week, wait-and-see posture . . . amount[s] to no accommodation at

all." *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991). In

*Arlington Transit*, the employee, a mechanic for a concrete-mixing company,

requested that he be permitted to leave early on Wednesdays to attend church

services. *Id.* at 220. The employer initially permitted the employee to leave early

on every Wednesday, but after a modification in shift scheduling, the employer began allowing him to leave early on Wednesdays only if all delivery trucks had returned safely to the garage.  *Id.* at 221.  On the first week of the new policy, the employee was able to leave early as all trucks had returned, but when he left early the following week despite all trucks not having returned, he was terminated.  *Id.*  The court rejected the employer's "ad hoc arrangement contemplating that the inevitable collision between [the employee]'s religious beliefs and the [employer]'s new work schedule would be dealt with when it arose."  *Id.* at 222.  Here, too, USPS's shift-swap policy was no accommodation at all.  Groff had to wait-and-see, week-to-week whether USPS would ask him to violate his conscience.  Groff's supervisor admitted the program was "kind of arbitrary."  JA 457.  And, as the accommodation played out in reality, Groff was presented time and again with a dilemma: work on Sundays or face discipline.  The statute prohibits USPS from putting Groff to this choice.

Because USPS failed to offer an accommodation that eliminated the conflict between Groff's work duties and religious beliefs, the district court erred in granting summary judgment to USPS on this aspect of Groff's failure-to-accommodate claim.

**III.    The district court erroneously concluded that USPS satisfied its burden to demonstrate that granting a religious accommodation would cause undue hardship.**

In addition to adopting an erroneous interpretation of Title VII's accommodation requirement, the district court wrongly held that USPS satisfied its burden to show that accommodating Groff would cause an undue hardship to USPS. USPS admitted at the time that it had discovered an accommodation that did *not* cause undue hardship—scheduling an extra RCA whenever Groff was scheduled on a Sunday—but it discontinued that practice. USPS's litigation position relies on a misreading of precedent regarding the effect of union agreements and invokes hardships that stem from alleged negative effects on Groff's co-workers, rather than concrete evidence of harm to USPS's business, which both Postmaster Hess and USPS's corporate representative disavowed. Groff is entitled to summary judgment.

**A.    Under the standard applied in current case law, USPS cannot demonstrate undue hardship.**

The employer bears the burden of demonstrating that granting a religious accommodation "would work an undue hardship upon the employer and its business." *GEO Grp.*, 616 F.3d at 271 (citation and internal quotation marks omitted). In *Hardison*, the Supreme Court held that an "undue hardship" is one that results in more than a *de minimis* cost to the employer. 432 U.S. at 84; *see also GEO Grp.*, 616 F.3d at 273. Both economic and non-economic costs can pose an undue hardship to employers, and the existence of an undue hardship depends on "the

specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship." *GEO Grp.*, 616 F.3d at 273.

The district court stated that "there is no need to examine each and every [undue-hardship] argument" raised by USPS because "*TWA v. Hardison* clearly shows that violation of a collectively bargained agreement is an undue hardship." JA 27.  The district court observed that "[t]here was no mechanism set forth in the MOU for an RCA to be skipped over in the Sunday scheduling" and therefore concluded that *Hardison* compelled a finding of undue hardship.  *Id.*  The district court added that, even apart from the MOU, accommodating Groff would "cause[] more than a *de minimus* [sic] impact on co-workers" and thus "create[] an undue hardship."  JA 29.

The district court erred in its conclusions that the existence of the MOU established undue hardship and that USPS proved as a matter of law that accommodating Groff would cause an undue hardship to the conduct of its business.

> ## 1.    The MOU does not establish undue hardship because accommodating Groff violated no other employee's seniority rights.

The district court both misread and misapplied *Hardison* in holding that any accommodation that would "violate" any term of a collectively bargained agreement establishes an undue hardship as a matter of law.  *Hardison* does not sweep nearly

so broadly, and in any event, accommodating Groff did not require violating the MOU.

*Hardison* examined the relationship between religious accommodation and an employer's collectively bargained seniority system. 432 U.S. at 79–81. Hardison's religious beliefs prohibited secular work from sundown Friday to sundown Saturday, and his position required him to work on Saturdays. *Id.* at 67–68. He initially had sufficient seniority to bid on a shift that did not conflict with his religious beliefs, but when he transferred to another location where he had lower seniority, Hardison was unable to bid on a shift that allowed him to always avoid working on Saturdays. *Id*. at 68. With the union unwilling to violate the seniority provisions in the CBA and the employer rejecting a proposal that Hardison work only four days per week, Hardison was forced to work on Saturdays. *Id*. at 68–69. When Hardison refused to report to work and was terminated, he brought a Title VII action. *Id.* at 69.

In ruling for the employer, the Court emphasized that to accommodate Hardison, the employer would have had to violate the CBA's seniority system. *Id.* at 81. It stressed the importance of seniority provisions to the functioning of CBAs:

> Hardison and the EEOC insist that the statutory obligation to accommodate religious needs takes precedence over both the collective-bargaining contract and the seniority rights of TWA's other employees. We agree that neither a collective-bargaining contract nor a seniority system may be employed to violate the statute, but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement. Collective bargaining, aimed at effecting workable

> and enforceable agreements between management and labor, lies
> at the core of our national labor policy, and seniority provisions
> are universally included in these contracts. Without a clear and
> express indication from Congress, we cannot agree with
> Hardison and the EEOC that an agreed-upon seniority system
> must give way when necessary to accommodate religious
> observances.

*Id*. at 79.

The Court found critical support for this conclusion in Title VII's special exemption for seniority systems. *Id.* at 81–82 (citing 42 U.S.C. § 2000e-2(h)). Title VII provides that "[n]otwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system." 42 U.S.C. § 2000e-2(h). "Thus, absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Hardison*, 432 U.S. at 82. Consequently, the Court held that the employer "was not required by Title VII to carve out a special exception to its seniority system in order to help [the employee] to meet his religious obligations." *Id*. at 83.

Accordingly, *Hardison* stands for the narrow rule that an employer need not offer an accommodation where doing so would violate the seniority provisions of a CBA. *Hardison* does not create the much broader rule adopted by the district court.

After all, only seniority provisions—not all other CBA provisions—are expressly

exempted from Title VII's requirements (including the duty to provide religious

accommodation). The Supreme Court itself has recognized *Hardison*'s limited

scope: "This Court has held that, in the context of a Title VII religious discrimination

case, an employer need not adapt to an employee's special worship schedule as a

'reasonable accommodation' where doing so would conflict with the seniority rights

of other employees." *Barnett*, 535 U.S. at 403 (citing *Hardison*, 432 U.S. at 79–80);

*see also Fouche v. NJ Transit*, 470 F. App'x 96, 96–97 (3d Cir. 2012) ("This

accommodation would have placed an undue hardship on [the employer] as [the

employee]'s election not to drive on certain Sundays would have resulted in a breach

of the seniority provision of the union's collective bargaining agreement, thus raising

a legal issue.").[4] No circuit has applied *Hardison* outside the context of seniority

systems, and the district court cited no cases endorsing its broad rule.

---

[4] The courts of appeals also describe *Hardison*'s holding narrowly. *See, e.g.*, *Antoine v. First Student, Inc.*, 713 F.3d 824, 838 (5th Cir. 2013) ("In *Hardison*, the Supreme Court relied on the district court's finding that the seniority provisions in the CBA precluded the possibility of plaintiff's changing his shift.") (cleaned up); *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 519 (6th Cir. 2002) ("And so it goes that in the matter at hand, the district court properly found that where any of Plaintiff's proposed accommodations had the ability of violating the collective bargaining agreement by interfering with the seniority system, Defendant was not required to accommodate Plaintiff."); *Opuku-Boateng*, 95 F.3d at 1470 ("In *Hardison,* the proposed accommodation would have conflicted with the contractually-established seniority system, thus violating an employee's seniority rights under the collective bargaining agreement by denying him his shift

This Court should not be the first to expand *Hardison* beyond seniority rights because the rule adopted by the district court produces alarming consequences. Under the district court's reading of *Hardison*, Title VII would permit employers and unions to contract away an individual employee's right to a workplace free from religious discrimination. So long as employer and union have bargained for a contractual term, that provision would take precedence over an employee's statutory rights. Such an interpretation would not only hollow out Title VII's accommodation provision, it would also conflict with other provisions of the statute. Title VII prohibits a union to "cause or attempt to cause an employer to discriminate against an individual in violation of this section," 42 U.S.C. § 2000e-2(c)(3), and accordingly, "a union cannot lawfully bargain for the establishment or continuation of discriminatory practices." *Emporium Capwell Co. v. W. Addition Cmty. Org.*, 420 U.S. 50, 70 (1975) (citing 42 U.S.C. § 2000e-2(c)(3)). The *Hardison* Court allowed seniority provisions to trump religious accommodations only because those

---

preferences. By contrast, in this case, the scheduling of shifts was not governed by any collective bargaining agreement, and the proposed accommodation would not have deprived any employee of any contractually-established seniority rights or privileges, or indeed of any contractually-established rights or privileges of any kind.") (citation omitted); *Mann v. Frank*, 7 F.3d 1365, 1369 (8th Cir. 1993) ("Although neither a collective bargaining agreement nor a seniority system may be employed to violate Title VII, the Court concluded that the duty to reasonably accommodate does not require an employer to jeopardize its overall labor scheme by compromising the contractual seniority rights of other employees as secured by a collective bargaining agreement.").

provisions are exempted from Title VII's prohibitions on discrimination. But there is no statutory warrant to expand that exception to other provisions of a CBA.

It is undisputed that accommodating Groff would not violate seniority provisions in the MOU. Groff and USPS agree that RCAs have no contractual right to specific days off; Sunday deliveries were assigned without regard to seniority; and no RCA had a superior right to have Sunday off than any other RCA. JA 532–33 ¶¶ 45, 47–48. Thus, no RCA could complain that accommodating Groff would violate his or her seniority rights, or any other contractual rights for that matter. *See Hardison*, 432 U.S. at 81 (accommodation there would "deprive [co-workers] of their contractual rights"). Accordingly, *Hardison*'s narrow rule does not apply, and the existence of the MOU cannot establish undue hardship.

For similar reasons, even if *Hardison*'s rule extended beyond seniority provisions, the district court erred in concluding that accommodating Groff would "violate" the MOU. To be sure, the MOU did not affirmatively provide a mechanism for "[s]kipping Groff in the Sunday rotation and never scheduling him to work on that day of the week." JA 27, 675–76. But, unlike in *Hardison*, skipping Groff as a religious accommodation and scheduling another RCA in his place would not have violated any RCA's contractual rights. Thus, while the MOU generally required RCAs to be available for Sunday delivery, nothing in the MOU precluded offering Groff a religious accommodation.

44

**2.    USPS fails to offer concrete proof that accommodating Groff would cause material economic or non-economic costs to the conduct of its business.**

Apart from the MOU, the district court erred in inferring undue hardship *on USPS* from USPS's speculation about the effect that accommodating Groff would have on *his co-workers*.  Moreover, USPS's theory relies on hardship caused by its *failure* to accommodate Groff, rather than any adverse effects of accommodating Groff by skipping over him in the Sunday rotation—something USPS repeatedly conceded did not cause undue hardship.

An employer asserting undue hardship must offer factual proof to support its defense.  Any proffered hardship must be "real rather than speculative, merely conceivable, or hypothetical. . . . Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts." *Brown v. Polk Cnty.*, 61 F.3d 650, 655 (8th Cir. 1995) (citations and internal quotation marks omitted); *see also Firestone*, 515 F.3d at 317 (same); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir. 1989) (same); *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1086 (6th Cir. 1987) (same); *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (same).  USPS has not presented such evidence.  In fact, the evidence demonstrates the absence of an undue hardship.

In his July 31, 2018 email, Postmaster Hess forthrightly admitted that providing Groff an exemption from Sunday deliveries did not pose an undue

hardship to the conduct of USPS's business.  JA 684.  He explained to the scheduling supervisors that when USPS automatically scheduled an extra RCA to cover Groff's Sunday deliveries, USPS did not suffer an undue hardship; instead, hardship arose only when USPS scheduled Groff but he did not report to work:

> I understand the thought process of automatically schedule an extra RCA.  The dilemma is that a volunteer RCA is not needed since an RCA is already prescheduled *and it does not show a hardship/burden to the USPS* because it is not necessary to force an RCA to work on their Sunday off.

*Id*. (emphasis added).  Hess reiterated that Groff could be disciplined only if "every effort was made to seek a volunteer and that [his] refusing to work is causing an undue hardship/burden on the USPS."  *Id*.  In other words, the evidence reflects that USPS's practice of automatically scheduling an extra RCA "satisfie[d] [Groff's] religious accommodation request for Sundays" and inflicted no undue hardship, *id*., but USPS discontinued that practice so that it could unnecessarily manufacture undue hardship by scheduling Groff.  JA 623.  Remarkably, the district court's opinion fails to acknowledge this evidence, much less explain how it does not dictate summary judgment in Groff's favor.

Similarly, USPS's Rule 30(b)(6) corporate representative Deborah Gless was unable to identify any costs incurred by USPS when skipping over Groff.  Gless conjectured that Groff's failure to work on Sundays would have a "[b]ig impact," specifically with regard to "[c]ost."  JA 648.  She identified costs such as paying

overtime to RCAs, later delivery times, and safety concerns. *Id.* But when asked whether these effects were actually felt by USPS or were merely hypothetical injuries, she conceded that she did not know. *Id.* Moreover, she admitted that she did not know what actually happened when Groff did not work on Sunday, and she did not know any specifics of the situation, such as which employees incurred overtime costs or if safety issues ever actually arose. JA 648–49.

Even more critically, when asked whether the same costs would arise if an extra RCA was scheduled in place of Groff, Gless conceded that USPS would *not* suffer a negative impact if an extra RCA were scheduled in advance to take Groff's place. JA 650–61. This accords with Hess's acknowledgment that USPS did not suffer any adverse impact when an extra RCA was automatically scheduled to cover Groff's Sunday deliveries. JA 684.[5] USPS fails even to create a fact issue on undue hardship.

While glossing over this adverse evidence, the district court relied principally on the alleged effect of Groff's accommodation on co-workers, stating that "[m]any courts have recognized that an accommodation that causes more than a *de minimus* [sic] impact on co-workers creates an undue hardship." JA 29. That is legally

---

[5] The district court dismissed Gless's admission in a footnote, finding it "irrelevant" because skipping Groff in the rotation would violate the MOU and negatively affect co-workers. JA 30 n.3. Even if those effects could constitute an undue hardship here—which they do not—they would at most create a fact issue when juxtaposed with the testimony of USPS's corporate representative and Postmaster Hess.

incorrect. An employer does not establish undue hardship by pointing to a more than *de minimis* impact on a co-worker. *Crider*, 492 F. App'x at 614 ("UTK seems to twist the district court's finding and the *Hardison* decision by insisting that a significant effect on a *co-worker* will suffice to establish an undue hardship."). "Title VII does not exempt accommodation which creates undue hardship on the *employees;* it requires reasonable accommodation 'without undue hardship on the conduct of *the employer's business.*'" *Id.* (quoting 42 U.S.C. § 2000e(j)). Thus, the employer must show with concrete evidence how the impact on the co-workers unduly burdens the employer's business operations. *Id.* ("Thus, *Hardison* does not stand for the proposition that employee dissatisfaction or inconvenience alone creates an undue hardship; rather, it is the *effect* such dissatisfaction has on the employer's ability to operate its business that may alleviate the duty to accommodate.").

"Certainly, every religious accommodation will inevitably cause some differences in treatment among employees, and differential treatment alone is not enough to create an undue hardship." *Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011).[6] However, "employee morale problems could become so acute that they

---

[6] *Harrell* was cited by the district court as holding that an effect on co-workers equals undue hardship. But *Harrell* was similar to *Hardison* because the requested accommodation would have "substantially imposed" on co-workers by "effectively violat[ing]" the employer's "long-standing seniority system." 638 F.3d at 981.

would constitute undue hardship and [] such discontent can lead to chaotic personnel problems." *Crider*, 492 F. App'x at 615 (citation and internal quotation marks omitted). USPS's evidence falls short of showing that accommodating Groff would cause the sort of acute morale or personnel problems that could materially harm USPS's business operations. Instead, USPS offers hearsay about employees' feelings when Groff did not report for work on Sundays for which he was scheduled (as opposed to morale when a replacement RCA was scheduled in advance). JA 38 ¶ 51. This is tantamount to the "mere grumbling" rejected as undue hardship in *Crider*.[7] 492 F. App'x at 615.

---

Similarly, in *Miller*, a district court decision affirmed by this Court, the accommodation caused undue hardship because it would have violated seniority rights under a CBA. 351 F. Supp. 3d at 790–91. To the extent some courts have suggested that impact on co-workers alone suffices to establish undue hardship, that cannot be squared with *Abercrombie*'s command to give "favored treatment" to employees' religious practices and allow them to engage in these practices "despite the employer's normal rules to the contrary." 575 U.S. at 772 n.2, 775.

[7] By contrast, in *Aron v. Quest Diagnostics, Inc.,* 2005 WL 1541060 (D.N.J. June 30, 2005), *aff'd*, 174 F. App'x 82 (3d Cir. 2006), the employer proved that accommodating the plaintiff would require hiring additional employees and increasing the number of Saturdays that existing employees were required to work, which would negatively affect their performance and thereby harm the quality of services rendered to the employer's patients. *Id*. at *6. The employer relied on an affidavit from an employee who had worked for the employer a number of years, oversaw the relevant branch of the employer's operations, and managed "a workforce of 1,000 employees and supervised about 35 supervisors." *Id*. at *2. This Court affirmed "for substantially the same reasons set forth in the District Court's opinion." 174 F. App'x at 83.

The district court focused exclusively on alleged hardship for a co-worker at the Holtwood station, who in 2017 was the only RCA besides Groff at that station. JA 29. But the district court overlooked that, at most, those enhanced burdens existed only for a few weeks of the year that constituted "peak" season. JA 532 ¶ 42. During non-peak season, RCAs were drawn from all of Lancaster County's stations. JA 532 ¶ 43. Nor did the district court (or USPS) attempt to reconcile its reliance on the Holtwood co-worker with Hess's contemporaneous admission that scheduling an additional RCA to replace Groff had not posed an undue hardship to USPS. Given the USPS corporate representative's similar concession, the district court's reliance on a single worker's burdens for a few weeks in a single year does not establish an undue hardship on USPS's business operations—and it certainly does not do so as a matter of law.

> **B.**    ***Hardison*'s more-than-*de-minimis* standard contravenes statutory text and conflicts with other civil rights laws.**

If this Court affirms the district court's judgment, Groff intends to ask the Supreme Court to reconsider *Hardison*'s more-than-*de-minimis* standard. On three occasions, several Justices have signaled their willingness to revisit *Hardison*. *See Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227, 1228 (2021) (Gorsuch, J., joined by Alito, J., dissenting from the denial of certiorari) ("There, this Court dramatically revised—really, undid—Title VII's undue hardship test."); *Patterson v. Walgreen Co.*, 140 S. Ct. 685, 685 (2020) (Alito, J., joined by Thomas, J. and

Gorsuch, J., concurring in the denial of certiorari) ("I agree . . . that we should reconsider the proposition, endorsed by the opinion in [*Hardison*] that Title VII does not require an employer to make any accommodation for an employee's practice of religion if doing so would impose more than a *de minimis* burden."); *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019) (Alito, J., joined by Thomas, J., Gorsuch, J., and Kavanaugh, J., respecting the denial of certiorari) ("[I]n [*Hardison*], the Court opined that Title VII's prohibition of discrimination on the basis of religion does not require an employer to make any accommodation that imposes more than a *de minimis* burden.  In this case, however, we have not been asked to revisit [that] decision[].").

"*Hardison*'s *de minimis* cost test does not appear in the statute."  *Small*, 141 S. Ct. at 1228.  "*Hardison*'s reading does not represent the most likely interpretation of the statutory term 'undue hardship'; the parties' briefs in *Hardison* did not focus on the meaning of that term; no party in that case advanced the *de minimis* position; and the Court did not explain the basis for this interpretation."  *Patterson*, 140 S. Ct. at 686.  As Justice Marshall noted in dissent, "the *de minimis* cost test cannot be reconciled with the 'plain words' of Title VII, defies 'simple English usage,' and 'effectively nullif[ies]' the statute's promise."  *Small*, 141 S. Ct. at 1228 (quoting *Hardison*, 432 U.S. at 88, 89, 93 n.6 (Marshall, J., dissenting)).

In the time since *Hardison*, Congress has enacted civil rights laws with an "undue hardship" defense, including the Americans with Disabilities Act, the Uniformed Services Employment and Reemployment Rights Act, and the Affordable Care Act. *Id*. "Under all three statutes, an employer must provide an accommodation unless doing so would impose 'significant difficulty or expense' in light of the employer's financial resources, the number of individuals it employs, and the nature of its operations and facilities." *Id*. This construction of "undue hardship" is more aligned with the plain words of Title VII and the Supreme Court's admonition that Title VII gives "favored treatment" to employees' religious practices and allows them to engage in these practices "despite the employer's normal rules to the contrary." *Abercrombie*, 575 U.S. at 772 n.2, 775. The Supreme Court should grant review in an appropriate case to overrule *Hardison*'s more-than-*de-minimis* standard. Thus, while Groff recognizes that this argument is precluded by Supreme Court precedent, he includes it here to preserve it for future review.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court reverse the grant of summary judgment in favor of Defendant and grant summary judgment in favor of Plaintiff.

Dated:  July 28, 2021

Respectfully submitted,

  /s/ Hiram Sasser
Hiram Sasser
David J. Hacker
Stephanie N. Taub
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX 75075
Tel: (972) 941-4444

  /s/ Randall Luke Wenger
Randall Luke Wenger
Jeremy L. Samek
INDEPENDENCE LAW CENTER
23 North Front Street
Harrisburg, PA 17101
Tel: (717) 657-4990

  /s/ Aaron M. Streett
Aaron M. Streett
Christopher E. Tutunjian
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel: (713) 229-1234

  /s/ David W. Crossett
David W. Crossett
CORNERSTONE LAW FIRM, LLC
8500 Allentown Pike, Suite 3
Blandon, PA 19510
Tel: (610) 926-7875

  /s/ Alan J. Reinach
Alan J. Reinach
CHURCH STATE COUNCIL
2686 Townsgate Road
Westlake Village, CA 91361
Tel: (805) 413-7398

*Attorneys for Plaintiff-Appellant*
*Gerald E. Groff*

## COMBINED CERTIFICATIONS

I, the undersigned, hereby certify the following:

1.      That I am a member of the Bar or the United States Court of Appeals for the Third Circuit.

2.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,737 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

4.      That the text of the electronic and paper versions of the foregoing brief are identical.

5.      That a virus check was performed on this brief using Microsoft Defender Antivirus Version 4.18.2106.6, and that no virus was indicated.

6.      That, on July 28, 2021, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

Dated:  July 28, 2021                          _/s/ Christopher E. Tutunjian_
                                               Christopher E. Tutunjian