No. 21-1900

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

GERALD E. GROFF,

*Plaintiff–Appellant,*

v.

LOUIS DEJOY, Postmaster General,
United States Postal Service,

*Defendant–Appellee.*

---

Appeal from Order Granting Summary Judgment in Civil Action No. 5:19-cv-01879-JLS in the United States District Court for the Eastern District of Pennsylvania (Honorable Jeffrey L. Schmehl)

---

## BRIEF FOR DEFENDANT–APPELLEE

---

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

VERONICA J. FINKELSTEIN
LAUREN DeBRUICKER
Assistant United States Attorneys
615 Chestnut St., Suite 1250
Philadelphia, PA 19106
(215) 861-8598/8492

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ........................................................... 1

ISSUES PRESENTED ............................................................................ 2

INTRODUCTION .................................................................................... 3

STATEMENT OF THE CASE ................................................................ 6

SUMMARY OF THE ARGUMENT ...................................................... 18

STANDARD OF REVIEW .................................................................... 20

ARGUMENT ......................................................................................... 21

I.   The USPS offered Groff a reasonable accommodation. .................... 22

  A.  The USPS offered shift swapping, which is a reasonable accommodation. .................................................................................. 23

  B.  Title VII did not require the USPS to offer further accommodations .................................................................................. 31

    1.   Under the plain language of Title VII, a conflict need not be wholly eliminated for an accommodation to be reasonable .............. 33

      a.   The Court should focus on the term "reasonably accommodate" rather than the term "accommodate" in isolation .......................... 34

      b.   As "reasonable accommodation" is judged on a flexible sliding scale, even accommodations that do not completely eliminate the conflict between work and religion can be reasonable accommodations. ............................................................................ 36

      c.   A flexible reading aligns with the overall statutory scheme of Title VII. ...................................................................................... 41

      d.   A flexible reading harmonizes Title VII's language with the nearly identical language in the ADA. ........................................... 44

e.   Neither *Ansonia* nor *Abercrombie & Fitch* supports a contrary interpretation. ................................................................. 45

2.   Congress did not intend a complete elimination standard in Title VII. ....................................................................... 46

II. The USPS demonstrated that further accommodations would constitute an undue hardship. ................................................. 49

A.  The USPS demonstrated multiple hardships that exceed the *de minimus* threshold. ............................................................. 51

1.   Excusing Groff from Sunday work would violate a collectively bargained agreement. ....................................................... 52

2.   The USPS demonstrated at least four additional undisputed hardships ......................................................................... 57

B.  *Hardison* remains binding on this Court ...................................... 64

CONCLUSION ........................................................................... 67

CERTIFICATIONS ...................................................................... 68

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Agostini v. Felton*, 521 U.S. 203 (1997) .................................................. 65

*Albemarle Paper v. Moody*, 422 U.S. 405 (1975) .................................... 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................. 20

*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986) ................. *passim*

*Ardestani v. INS*, 502 U.S. 129 (1991) .................................................... 34

*Boys Mkts., Inc. v. Retail Clerk's Union*, 398 U.S. 235 (1970) ............... 35

*Brown v. Gen. Servs. Admin.*, 425 U.S. 820 (1976) ................................ 32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................ 20

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
   135 S. Ct. 2028 (2015) ............................................................. 42, 45, 46

*Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634 (2019) ........................ 64

*Milner v. Dep't of the Navy*, 562 U.S. 562 (2011) .............................. 46, 47

*NLRB v. Canning*, 573 U.S. 513 (2014) .................................................. 46

*Patterson v. Walgreen Co.*, 140 S. Ct. 685 (2020) ................................... 64

*Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019) .................... 35

*Rodriguez de Quijas v. Shearson/American Express Inc.*,
   490 U.S. 477 (1989) ................................................................................. 65

*Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227 (2021) ............. 64

*Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397 (1979) ................. 39, 40

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) .......... *passim*

*United States v. James*, 478 U.S. 597 (1986) .................................... 34, 35

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)............. 40, 41

*US Airways, Inc. v. Barnett,* 535 U.S. 391 (2002) ................................. 44

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) .......................................................................... 35

## FEDERAL CIRCUIT COURT CASES

*Antoine v. First Student, Inc.*, 713 F.3d 824 (5th Cir. 2013) .................. 25

*Baker v. Home Depot*, 445 F.3d 541 (2d Cir. 2006)................................. 33

*Balint v. Carson City*, 180 F.3d 1047 (9th Cir. 1999)....................... 59, 60

*Beadle v. Hillsborough Cnty. Sheriff's Dep't.*,
   29 F.3d 589 (11th Cir. 1994)......................................................... 27, 50

*Brener v. Diagnostic Ctr. Hosp.*,
   671 F.2d 141 (5th Cir. 1982)...................................................... *passim*

*Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495 (5th Cir 2001) ........ 33

*Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997)............................ 38

*Bush v. Regis Corp.*, 257 F. App'x 219 (11th Cir. 2007) ......................... 26

*Cooper v. Oak Rubber Co.*, 15 F.3d 1375 (6th Cir. 1994) ................. 29, 33

*Creusere v. Bd. of Educ. of the City Sch. Dist. of Cincinnati*,
   88 F. App'x 813 (6th Cir. 2003) ........................................................ 59

*Crider v. Univ. of Tenn.*, 492 F. App'x 609 (6th Cir. 2012)............. *passim*

*Draper v. United States Pipe & Foundry Co.*,
   527 F.2d 515 (6th Cir. 1975)........................................................ 61, 62

*EEOC v. Arlington Transit Mix, Inc.*,
   957 F.2d 219 (6th Cir. 1991)........................................................ 29, 30

*EEOC v. Firestone Fibers & Textiles Co.*,
   515 F.3d 307 (4th Cir. 2008)................................................. 24, 33, 50

*EEOC v. Geo Grp., Inc.*, 616 F.3d 265 (3d Cir. 2010) ........... 20, 37, 50, 60

*EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir. 1997) ............ 33

*EEOC v. Robert Bosch Corp.*, 169 F. App'x 942 (6th Cir. 2006) ....... 25, 26

*Genas v. Dep't of Corr. Servs.*,
     75 F.3d 825 (2d Cir. 1996) ..................................................................... 24

*Getz v. Pa. Dep't of Pub. Welfare*, 802 F.2d 72 (3d Cir. 1986) .......... 54, 55

*Hudson v. W. Airlines, Inc.*, 851 F.2d 261 (9th Cir. 1988) ...................... 24

*Jean-Pierre v. Naples Cmty. Hosp., Inc.*,
     817 F. App'x 822 (11th Cir. 2020) ..................................................... 27

*Lee v. ABF Freight System, Inc.*, 22 F.3d 1019 (10th Cir. 1994) ............ 57

*Mann v. Frank*, 7 F.3d 1365 (8th Cir. 1993) ........................................... 54

*McGuire v. Gen. Motors Corp.*, 956 F.2d 607 (6th Cir. 1992) ................. 27

*Miller v. Drennon*, No. 91-2166,
     1992 U.S. App. LEXIS 14449 (4th Cir. June 19, 1992) ...................... 27

*Miller v. Port Auth. of N.Y. & N.J.*,
     788 F. App'x 886 (3d Cir. 2019) ......................................................... 25

*Morrissette-Brown v. Mobile Infirmary Med. Ctr.*,
     506 F.3d 1317 (11th Cir. 2007) ........................................................... 24

*Opuku-Boateng v. California*, 95 F.3d 1461 (9th Cir. 1996) ........... 24, 33

*Patterson v. Walgreen Co.*, 727 F. App'x 581 (11th Cir. 2018) ......... 26, 27

*Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129 (3d Cir. 1986),
     *cert. denied*, 479 U.S. 972 (1986) ................................................. *passim*

*Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*,
     673 F.3d 1 (1st Cir. 2012) ............................................................ 24, 33

*Shelton v. Univ. of Med. & Dentistry of N.J.*,
     223 F.3d 220 (3d Cir. 2000) ................................................................ 33

*Smith v. Pyro Min. Co.*, 827 F.2d 1081 (6th Cir. 1987) .......................... 26

*Sturgill v. United Parcel Service, Inc.*,
 512 F.3d 1024 (8th Cir. 2008) ....................................................... 24, 33

*Tabura v. Kellogg USA*, 880 F.3d 544 (10th Cir. 2018) ............. 25, 28, 33

*Thomas v. Nat'l Ass'n of Letter Carriers*,
 225 F.3d 1149 (10th Cir. 2000) ............................................................ 24

*United States v. Bd. of Educ. for Sch. Dist.*,
 911 F.2d 882 (3d Cir. 1990) ................................................................ 50

*United States v. City of Albuquerque*,
 545 F.2d 110 (10th Cir. 1976) ............................................................ 26

*United States v. Extreme Assocs., Inc.*,
 431 F.3d 150 (3d Cir. 2005) ................................................................ 65

*Vande Zande v. Wis. Dep't of Admin.*,
 44 F.3d 538 (7th Cir. 1995) ................................................................. 38

*Virts v. Consol. Freightways Corp.*, 285 F.3d 508 (6th Cir. 2002) .......... 54

*Walden v. Ctrs. For Disease Control & Prevention*,
 669 F.3d 1277 (11th Cir. 2012) ........................................................... 33

*Webb v. City of Phila.*, 562 F.3d 256 (3d Cir. 2009) .......................... 20, 50

*Weber v. Roadway Express, Inc.*, 199 F.3d 270 (5th Cir. 2000) ............. 57

*Williams v. Sec'y Pa. Dep't of Corr.*,
 450 F. App'x 191 (3d Cir. 2011) .......................................................... 20

## FEDERAL DISTRICT COURT CASES

*Miller v. Port Auth. of N.Y. & N.J.*,
 351 F. Supp. 3d 762 (D.N.J. 2018) ...................................................... 28

*State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*,
 250 F.R.D. 203 (E.D. Pa. 2008) .......................................................... 59

## STATUTES

28 U.S.C. § 1291 ................................................................ 1

28 U.S.C. § 1331 ................................................................ 1

42 U.S.C. § 12181 ............................................................ 43

42 U.S.C. § 12112 ............................................................ 44

42 U.S.C. § 2000 ........................................................ *passim*

## RULES

Fed. R. Civ. P. 56............................................................ 20

## REGULATIONS

29 C.F.R. § 1605 ...................................................... 24, 32

## GUIDANCE

EEOC-CVG-2021-3, Section 12: Religious Discrimination, available at https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref233.................................. 42, 43, 47, 48

## SECONDARY SOURCES

8A Charles Alan Wright *et al.*,
Federal Practice and Procedure § 2103 (Supp. 2007)...........................59

Black's Law Dictionary (11th ed. 2019)................................36

Merriam-Webster Third New International Dictionary (2020) ....... 36, 38

## LEGISLATIVE MATERIALS

118 Cong. Rec. 706 (1972) (statement of Senator Randolph)................47

H.R. 1431, 110th Cong. (2007) ................................................65

H.R. 1445, 109th Cong. (2005) ................................................65

H.R. 2948, 105th Cong. (1997) ................................................65

H.R. 4117, 104th Cong. (1996) ................................................................. 65

H.R. 4237, 106th Cong. (2000) ................................................................. 65

H.R. 5233, 103d Cong. (1994) .................................................................. 65

S. 1124, 105th Cong. (1997) ..................................................................... 65

S. 1668, 106th Cong. (1999) ..................................................................... 65

S. 2071, 104th Cong. (1996) ..................................................................... 65

S. 2572, 107th Cong. (2002) ..................................................................... 65

S. 3628, 110th Cong. (2008) ..................................................................... 65

S. 3686, 112th Cong. (2012) ..................................................................... 65

S. 4046, 111th Cong. (2010) ..................................................................... 65

S. 677, 109th Cong. (2005) ....................................................................... 65

S. 893, 108th Cong. (2003) ....................................................................... 65

S. 92, 105th Cong. (1997) ......................................................................... 65

## CERTIORARI PETITIONS

Petition for Writ of Certiorari, *Dalberiste v. GLE Associates Inc.*,
    141 S. Ct. 2463 (2020) (No. 19-1461).................................................. 64

# **JURISDICTIONAL STATEMENT**

The district court had jurisdiction over the original claims in this civil action under 28 U.S.C. § 1331 because those claims were asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII"). On April 6, 2021, the district court granted summary judgment in favor of the defendant, the Postmaster General of the United States Postal Service (the "USPS"). On May 5, 2021, Groff timely appealed. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

The USPS accommodated Groff's Sabbatarian religious beliefs by offering, and facilitating, shift swapping with other employees when he was scheduled to work on a Sunday. Should this Court affirm the district court's holding on the basis that shift swapping was a reasonable accommodation?

*Suggested answer*: Yes

Excusing Groff from Sunday work would violate a collectively bargained agreement and impose numerous other burdens on the USPS. Should this Court affirm the district court's holding on the alternative basis that the USPS would suffer undue hardship by offering Groff additional accommodations?

*Suggested answer*: Yes

## **INTRODUCTION**

Title VII represents a careful, deliberate balance between the needs of an employer and an employee. Pursuant to Title VII, an employer may not take an "adverse employment action" against an employee because of that employee's religion. 42 U.S.C. § 2000e-2(a). The employer must "reasonably accommodate" an employee's religious observances, practices, and beliefs, unless doing so would cause "undue hardship on the conduct of the employer's business." *Id.* at § 2000e(j).

In this case, employee Groff's Sabbatarian beliefs preclude him from working on Sundays. Yet as a Rural Carrier Associate (an "RCA"), an essential function of his job was to be available to fill in for other carriers on any day when mail was delivered. And, by virtue of a collectively bargained agreement, his duties also included serving in the rotation of employees scheduled to work on Sundays. To accommodate Groff's beliefs, the USPS offered Groff shift swapping—trading any scheduled Sunday shifts with another willing employee.

Despite the fact that this was precisely the accommodation deemed reasonable by the United States Supreme Court in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), and that this case

3

remains good law, Groff insists that this accommodation was not a "reasonable accommodation," and, in fact, was not an "accommodation" at all. He argues that Title VII requires that he simply be skipped in the rotation every Sunday regardless of how this would impact the USPS, his employer, or other employees. He argues that an accommodation is only reasonable when it completely eliminates the conflict between work and religion. This is not the *Hardison* standard nor is this definition grounded in Title VII.

The district court declined to adopt this definition, because such an interpretation contradicts the plain language and Congressional intent of Title VII. Instead, the district court concluded that the term "reasonably accommodate" does not require "total" or "complete" accommodation. Groff's job duties required him to be available to fill in as needed. It would not have been reasonable to obviate all Sunday shifts wholesale, as that would eliminate an essential function of his job. The district court correctly concluded that the USPS had offered a *reasonable* accommodation when it not only permitted Groff to swap shifts with another carrier, but also facilitated the process for him. On this basis alone, the district court could have granted summary

4

judgment for the USPS and on this basis alone this Court can and should affirm.

The district court concluded that the USPS would face an undue hardship from further accommodations. Skipping Groff in the rotation would violate a collectively bargained agreement, a form of undue hardship recognized in *Hardison*. Moreover, the USPS identified other negative operational impacts which Groff did not rebut. This undue hardship gave the district court a second independent justification to grant summary judgment. It provides this Court an additional basis on which to affirm. This Court should decline Groff's invitation to rewrite the law and instead affirm the district court because it enforced existing law and respected the balance inherent therein.

## STATEMENT OF THE CASE

After decades of damaging financial losses, in 2013 the USPS signed a contract with Amazon to deliver packages on Sundays. JA 34 ¶18-19. Amazon package delivery had to be a success if the USPS were to regain its financial footing. JA 34 ¶20. The Amazon contract triggered changes throughout USPS's business, impacting various employees including RCAs. JA 33-34 ¶18-25. This case concerns one such RCA, Groff, who worked for the USPS in its Holtwood station until he resigned on January 18, 2019. JA 51 ¶38.

Groff had initially worked for the USPS as a part-time, flexible mail carrier in 2010 before leaving the organization. JA 33 ¶12. He returned in 2012 and was hired as an RCA at the Quarryville station. JA 33 ¶13, 527 ¶4. Unlike full time career mail carriers ("regular carriers") whose seniority allows them to bid on specific set routes and schedules, an RCA's sole function is to fill in as needed. JA 33 ¶17. As a result, RCAs have always been required to be flexible and work weekends and holidays. JA 33 ¶15. Even before the Amazon contract, this sometimes meant working on Sundays. *Id*. RCAs do not earn time off ("leave"). JA 34 ¶17, JA 82, JA 727 ¶17. RCAs may request leave,

6

but it is granted only when consistent with the USPS's operational needs. JA 33 ¶17.

Amazon Sunday delivery did not begin in all USPS stations simultaneously. JA 34 ¶19, JA 35 ¶26, JA 36 ¶¶33, 26. In 2015, the Quarryville station was not yet delivering Amazon packages on Sundays. JA 35 ¶26. Quarryville was a large station with numerous carriers. JA 35 ¶27. Without the increased demands of delivering Amazon packages, the Quarryville postmaster was able to meet the USPS's operational needs without scheduling Groff on Sundays. JA 35 ¶¶27-29. At that time, local management had discretion in Sunday scheduling. JA 35 ¶29.

As additional stations began Amazon delivery, the process for scheduling Sunday carriers was formalized. The USPS hired additional Assistant Rural Carriers ("ARCs"), who only work on Sundays and holidays. JA 458. Regular carriers had seniority and could not be required to work on Sundays. JA 636. They had bid on specific routes and schedules and were contractually entitled to work only those routes and schedules. *Id.* As a result, ARCs, RCAs, and other non-regular carriers handled Sunday delivery. JA 52 ¶47.

7

In 2016, the USPS and the National Rural Letter Carrier's Association ("NRLCA") negotiated a formal agreement to govern the Sunday scheduling process. JA 34 ¶21-22, JA 528 ¶8. NRLCA is the union that represents RCAs and certain other non-regular carriers. JA 34 ¶21, JA 47 ¶8, JA 91-92, JA 203-204. After negotiation, the USPS and the NRLCA executed a collectively bargained memorandum of understanding dated May 24, 2016 (the "MOU"). JA 34 ¶21, JA 203-204, JA 528 ¶8.

Pursuant to the MOU, each year was divided into two time periods: "peak season" and "non-peak season." JA 36 ¶41, JA 532 ¶42. During peak season, from November to January, Sunday delivery was scheduled and managed locally in each station. JA 36 ¶41. During peak season, a small station like Holtwood, which had a limited number of RCAs, was solely responsible for delivering Amazon packages on Sundays to all its customers. JA 36 ¶41.

Management in the Holtwood station had few options if an RCA was unavailable. JA 36 ¶32. Management could not force a regular carrier to work as doing so would violate a collectively bargained agreement. Management could not personally deliver the packages, as

8

this too would violate a collectively bargained agreement. JA 38 ¶56.

Management could try to borrow an RCA or other non-regular carrier

from another station, but carriers were rarely available or willing to

cover. JA 406. Delivering Amazon packages on Sundays created a lot of

work. JA 38 ¶49. Management in each station generally had to meet the

USPS's operational benchmarks with that station's own staff. JA 100.

This was exceptionally difficult for small station managers. JA 465-68.

During non-peak season, Sunday delivery was scheduled and

managed differently. Each USPS station was assigned to a large station

that served as a "hub" for surrounding smaller stations. JA 36-37 ¶41,

JA 97. The hub would create two alphabetical lists of all the RCAs from

the various stations assigned to the hub. JA 34 ¶23, JA 47 ¶10, JA 528

¶9(a). One list contained the names of RCAs who wanted to work every

Sunday and holiday. JA 34 ¶23, JA 47 ¶10, JA 528 ¶9(c). These

"volunteer" RCAs would be scheduled first. JA 35 ¶24, JA 47 ¶10. The

other list contained names of RCAs who had to be available to work on

Sundays and holidays, but who preferred not to work every time. JA 47

¶10, JA 528 ¶9(c). Management at the hub would rotate through these

"non-volunteer" RCAs, scheduling them as needed to meet the USPS's

operational needs. JA 47 ¶10, JA 528 ¶10. By rotating through the list, the obligation to work on Sundays and holidays was spread across the pool of non-volunteer RCAs while those RCAs who preferred to work these days received the maximum number of days.

The MOU carved out three limited exceptions that allowed an RCA to be skipped in the rotation. JA 35 ¶25, JA 47-48 ¶11, JA 528 ¶11. First, USPS management could skip an RCA in the rotation if that RCA was currently covering a long-term vacancy on another route. *Id*. Second, USPS management could skip an RCA if that RCA had been approved for leave. JA 35 ¶25(a), JA 528 ¶11(a). Third, USPS management could skip an RCA if scheduling that RCA would cause the USPS to pay overtime. JA 35 ¶25(b). The collectively bargained MOU recognized no other exceptions to the rotation. JA 203-204.

When Groff learned that the Quarryville station would begin Sunday Amazon delivery, he transferred to the Holtwood station, which had not yet implemented Amazon Sunday delivery. JA 36 ¶31, ¶¶33-34, ¶36. Holtwood was a small office, with only two or three total RCAs during certain periods. JA 36 ¶32. Groff worked in Holtwood without issue until March 2017, during off-peak season, when Holtwood began

10

Amazon Sunday delivery. JA 36 ¶37, JA 529 ¶17. Groff communicated

his refusal to work on Sundays to management, specifically Holtwood

Postmaster Brian Hess. JA 36 ¶40. He did not initially submit a formal

request for an accommodation. *Id*. Although Postmaster Hess was

sympathetic, he had limited options in light of the small size of the

Holtwood office. *Id*. Hess did his best to find coverage for Groff so that

Groff would not have to work on Sundays. JA 37 ¶¶43, 48, JA 39 ¶58.

Holtwood's hub was the Lancaster Carrier Annex. JA 36-37 ¶41.

Groff was scheduled to report there for delivery on Sunday, March 19,

2017. JA 37 ¶42. He did not report for work, nor did he report on the

twenty four other Sundays when he was scheduled between that date

and his January 18, 2019 resignation. JA 37 ¶47, 39 ¶57, 530 ¶21.

Although he did not immediately submit a formal request for an

accommodation, USPS management became aware that he had an issue

and responded to his perceived needs. JA 37 ¶44.

USPS management tried to accommodate Groff without violating

collectively bargained agreements or harming the organization's

operational needs. JA 37 ¶43. First, the USPS offered Groff the same

accommodations that had already been offered to other employees who

11

had religious conflicts with Sunday work—he could take another day off instead, or report after church services concluded. JA 37 ¶43, JA 530 ¶22, JA 531 ¶31. Groff refused these accommodations on the basis that he needed to observe Sunday, only Sunday, and the entirety of Sunday, as the sabbath. JA 32 ¶2.

Next, the USPS offered him shift swapping so he could have Sundays off if a volunteer carrier covered his shift for him. JA 37 ¶43. USPS management even facilitated the swapping by soliciting coverage for him within Holtwood and other area stations. JA 37 ¶48, JA 530 ¶22(c). In addition, so long as he was not coercing other employees, Groff was permitted to find his own coverage.[1] JA 37 ¶43. When another carrier agreed to cover his shift, Groff was excused from that Sunday shift without penalty. JA 37 ¶43(c), JA 530 ¶22(c).

Sunday Amazon delivery was unpopular among RCAs. JA 38 ¶50. Even with the accommodations USPS offered so RCAs could report after church services concluded, many RCAs quit rather than work Sundays.

---

[1] On a single occasion, Groff asked another carrier to cover for him. JA 470.

12

JA 38 ¶50-51. Stations found themselves even more short staffed than they had been—but now with the mandate to ensure Amazon Sunday delivery was successful. JA 34 ¶20.

Groff's absences negatively affected the USPS's operations. JA ¶¶52-56. Knowing that Groff refused to work on Sunday, USPS management had two options when it was Groff's turn. First, management could schedule him, knowing he would not come, and therefore risk that the USPS would be short staffed. This would comply with the MOU but create difficulty in getting the mail safely and timely delivered without increasing the USPS's operational costs and logistical demands.

Scheduling Groff only to have him no-show caused short staffing. JA 38 ¶¶52-53. Being short-staffed impacted everyone. JA 38 ¶53. When Groff or another RCA was missing, their packages were allocated to the carriers who did report to work. JA 492. This additional workload could cause delivery to take fifteen or sixteen hours, far beyond the typical RCA workday. JA 38 ¶50. The carriers who reported as scheduled faced long, exhausting days and dangerous conditions delivering packages in the dark, and, if from a station other than

13

Holtwood, on unfamiliar routes. JA 42 ¶87, JA 52 ¶50, JA 124-125.

They were extremely unhappy. JA 38 ¶51.

At the small Holtwood station, there were so few employees that, without Groff, Sunday deliveries were very difficult. JA 38 ¶53. Postmaster Hess sometimes delivered packages himself—violating a collectively bargained agreement. JA 38 ¶56. On other occasions, Postmaster Hess expended overtime on other carriers trying to make up for Groff's absence. JA 38 ¶55. He had no other choice but to somehow get the mail delivered. JA 130. Failing to deliver packages was not a practical option. JA 618-19.

Second, the other choice was to schedule an additional carrier to cover for Groff's absence, which caused other problems. It violated the MOU and exacerbated RCA morale issues. JA 38 ¶51. The USPS was always short staffed and there were never enough volunteer RCAs to work on Sundays. JA 38 ¶50. Some non-volunteer RCAs always had to work. If Groff was skipped in the rotation, this naturally meant that other RCAs had to work more often. JA 38 ¶54.[2] This did not go

---

[2] Groff claims that the USPS accommodated him for a period of time by scheduling another RCA and skipping him in the rotation.

unnoticed. In 2017, the only other RCA in Holtwood transferred to

another station specifically because he was scheduled to work every

Sunday to cover for Groff.  JA 38 ¶51; JA 467.

RCAs reporting to the Lancaster Annex during non-peak season

noticed too. One resigned because Groff was receiving favorable

treatment. JA 38 ¶51. She was not the only RCA who was upset. There

was talk of a boycott. JA 38 ¶51. Another RCA filed a grievance. *Id.*; *see*

*also* JA 501-08. In response to the grievance, NRLCA clarified that

───────────────────

(Appellant's Br. at 8.) This misconstrues the evidence. From March
2017 until July 2018, management scheduled him and then attempted
to find coverage. JA 623. Around July 2018, a new supervisor began
creating the schedule for the Lancaster Annex. *Id.* She was unclear
about what accommodations had been offered to Groff. *Id.* For
approximately one month she skipped him in the rotation and instead
scheduled a different RCA. *Id.* When this error was discovered, the
practice was discontinued because it violated the MOU and caused the
other problems discussed herein. *Id.*

Groff also suggests an email by Postmaster Hess about this error is
an admission that the practice caused no undue hardship. (Appellant's
Br. at 8.) This is untrue. Postmaster Hess is not a lawyer and cannot
draw legal conclusions. Skipping Groff in the rotation violated the
MOU. As argued herein, that is an undue hardship regardless of
Postmaster Hess's opinion. Moreover, contextualized, Postmaster Hess's
email was not about whether skipping Groff was possible, but rather
whether simply skipping him provided documentation that the USPS
was following its shift swapping procedure. JA 623,

Groff was not to be skipped in the rotation because doing so would violate the MOU. JA 516-17. In other words, Groff's union interpreted the MOU to prohibit skipping him.

The USPS faced a double bind. Scheduling Groff only to have him no show caused the USPS operational problems. Skipping Groff caused the USPS different operational problems. Although management's efforts may not have been perfect, management did its best. JA 37 ¶48.[3] They looked for coverage for Groff on every Sunday that he was scheduled. *Id*.; *see also* JA 469. This was difficult, time consuming, and diverted them from other managerial duties. JA 37-38 ¶48. Management did it anyway. Postmaster Hess convinced another RCA to cover for Groff for nearly the entire 2017 peak season. JA 39 ¶59. Another Holtwood RCA covered for Groff during the entire 2018 peak

_____

[3] Groff focuses on Postmaster Hess's choice of the term "arbitrary" to characterize his efforts to find coverage. (Appellant's Br. at 8, 37, citing JA 457.) This answer was in response to a question about the success of his efforts—not about how "diligent" or "consistent" he was in trying to find coverage. JA 457. Read in context, Postmaster Hess meant that he was only sometimes successful at finding that coverage, not that he failed to make consistent, diligent efforts to look. Groff ignores Postmaster Hess's testimony where he explained how he "consistently" and "faithful[ly]" sought coverage, "week in and week out." JA 469.

season. *Id.* Management found other RCAs who agreed to cover for Groff on individual Sundays. *Id.* For approximately two years, Groff did little to find his own coverage. JA 29, JA 38 ¶58. He relied on management, oblivious to the consequences to them or his fellow RCAs. JA 44 ¶107.

After Groff missed many scheduled Sundays,[4] the USPS initiated its multi-step, escalating disciplinary process. Despite there being no formal indication the USPS intended to terminate him, Groff ultimately resigned. JA 51 ¶38. He exhausted his administrative remedies and then filed a complaint in district court. The parties filed cross motions for summary judgment and the district court entered judgment for the USPS. Groff now appeals the entry of summary judgment for the USPS on his failure to accommodate claim.

---

[4] Indeed, Groff incurred far more absences than he was permitted under the strict terms of the disciplinary policy.

17

# SUMMARY OF THE ARGUMENT

Title VII represents a careful, deliberate balance between the needs of an employer and an employee. The USPS respected that balance and, as the district court found, was entitled to summary judgment in its favor on that basis. This Court should now affirm for two independent reasons.

First, Title VII requires an employer like the USPS to offer an employee with a religious conflict a reasonable accommodation. The USPS did so. It offered shift swapping, which the Supreme Court in *Hardison* approved as a reasonable accommodation. That should end the inquiry. Even absent this binding precedent, the plain language of Title VII and Congressional intent support a conclusion that the shift swapping was a reasonable accommodation here. The USPS had no obligation to fully eliminate every conflict between work and religion. This would not be reasonable. Being available to work every day, including on Sundays, was an essential function of the job of an RCA. Eliminating Sunday work could not be reasonable because this would remove that essential function. Instead, the USPS offered an accommodation that was reasonable—shift swapping. The offered

18

accommodation only needed to be reasonable, and it was. Because the USPS offered Groff a reasonable accommodation, it met its burden under Title VII and the Court need evaluate no further.

Second, even if the Court disagrees and finds that the shift swapping was not a reasonable accommodation, the Court should still affirm because the USPS demonstrated that further accommodations would constitute an undue hardship. Title VII does not require an employer like the USPS to endure such a hardship. Skipping Groff on every Sunday would violate a collectively bargained agreement, which the Supreme Court in *Hardison* held was an undue hardship. Although this hardship alone was sufficient, the USPS demonstrated at least four other additional undisputed hardships.

*Hardison* remains good law, and it applies in this case. The USPS both offered a reasonable accommodation and demonstrated undue hardship stemming from further accommodations. It was therefore entitled to summary judgment. This Court should respect the careful balancing of interests in Title VII and affirm the district court.

# STANDARD OF REVIEW

In a Title VII case like this one, the Court reviews a grant of summary judgment under the plenary standard of review. *Williams v. Sec'y Pa. Dep't of Corr.*, 450 F. App'x 191, 194 (3d Cir. 2011); *EEOC v. Geo Grp., Inc.*, 616 F.3d 265, 270 (3d Cir. 2010); *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir. 2009). Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A party opposing summary judgment, and asking for reversal on appeal, must point to evidence sufficient to convince a reasonable factfinder that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

# **ARGUMENT**

Title VII represents a careful, deliberate balance between the needs of an employer and an employee. Pursuant to Title VII, an employer may not take an "adverse personnel action" against a federal employee due to the employee's religion. 42 U.S.C. § 2000e-16(a) . An employer must "reasonably accommodate" an employee's religious observances, practices, and beliefs, unless doing so would cause "undue hardship on the conduct of the employer's business." *Id.* at § 2000e(j) .

Based on this language, a failure to accommodate case like this one involves a three-step analysis at the summary judgment stage. First, the employee must demonstrate his religious belief is sincere. That was not disputed for purposes of summary judgment. Second, the employer must show it offered a reasonable accommodation. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986). If it did, the analysis ends there and the employer prevails. If it did not, then, third, the employer must demonstrate that a reasonable accommodation (or an additional accommodation beyond what was offered) would cause it an undue hardship. *See Hardison*, 432 U.S. at 84. If it would, the employer prevails.

21

Here, the district court below properly concluded both that the USPS offered Groff a reasonable accommodation and that additional accommodations would cause the USPS undue hardship. On either or both of these two independent and equally dispositive grounds, this Court should affirm.

## I.  The USPS offered Groff a reasonable accommodation.

There is no dispute that the USPS offered Groff the accommodation of shift swapping in response to his formal request for an accommodation. Although Groff disagrees that he was allowed to find his own coverage (*see* Appellant's Br. at 7 n. 1), there is no dispute that shift swapping was permitted. Under *Hardison*, permitting shift swapping is a reasonable accommodation. Here the USPS did more than just permit shift swapping, it facilitated that swapping. On this basis alone this Court should affirm the district court below.

If the Court looks beyond *Hardison*, to conduct its own statutory analysis of Title VII, it should still affirm. Congress intended the term "reasonable accommodation" mean a fair adjustment to the work environment to better enable an employee to practice his religious beliefs. This reading is supported by both the plain text of Title VII and,

if the Court finds the plain text to be ambiguous, by Title VII's

legislative history. But even if the Court were to adopt Groff's contrary

interpretation, the Court should still affirm the district court because

the accommodations offered by the USPS meet even Groff's definition.

## A. The USPS offered shift swapping, which is a reasonable accommodation.

The USPS offered Groff a reasonable accommodation by

permitting shift swapping, thereby meeting its burden under Title VII.

The law is clear—offering shift swapping is a reasonable

accommodation. The law is also clear that shift swapping need not be

perfect—it remains a reasonable accommodation even if there are

occasions where no coverage is found.

The Supreme Court approved shift swapping as a reasonable

accommodation in *Hardison,* where a Sabbatarian employee was

permitted to avoid working on the sabbath by finding other employees

to cover for him. *See id*. at 76-78.[5] After *Hardison* was decided, the

Equal Employment Opportunity Commission (the "EEOC"), the agency

---

[5] The *Hardison* Court also addressed undue hardship, and this part of the Court's holding is discussed in section II herein.

23

tasked with enforcing Title VII, incorporated the *Hardison* holding in its regulations. Those regulations list voluntary shift swapping as an example of a reasonable accommodation. 29 C.F.R. § 1605.2.[6]

Since *Hardison* was decided, every circuit to squarely address the issue has agreed: shift swapping generally constitutes a reasonable accommodation. *See Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 16 (1st Cir. 2012); *Crider v. Univ. of Tenn.*, 492 F. App'x 609, 612 (6th Cir. 2012); *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 315-16 (4th Cir. 2008); *Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024, 1032 (8th Cir. 2008); *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1156-57 (10th Cir. 2000); *Genas v. Dep't of Corr. Servs.*, 75 F.3d 825, 832 (2d Cir. 1996); *Opuku-Boateng v. California*, 95 F.3d 1461, 1471 (9th Cir. 1996); *Hudson v. W. Airlines, Inc.*, 851 F.2d 261, 263 (9th Cir. 1988); *Brener v. Diagnostic*

---

[6] Groff elsewhere relies on EEOC guidance to support his argument but omits any discussion of the EEOC regulations when addressing shift swapping. (Appellant's Br. at 33-37.) Although EEOC guidance is not binding, it can be persuasive. *Albemarle Paper v. Moody*, 422 U.S. 405 (1975).

*Ctr. Hosp.*, 671 F.2d 141, 145 (5th Cir. 1982).[7] None of the cases Groff

cites disavow this general rule. (Appellant's Br. at 33-37.)

In an unreported decision, the Court agreed: shift swapping is a

reasonable accommodation. The employee in *Miller v. Port Auth. of N.Y.*

*& N.J.* argued that a voluntary shift swapping policy was not a

reasonable accommodation because the employer had failed to facilitate

swapping.[8] 788 F. App'x 886, 890 (3d Cir. 2019). The Court rejected this

argument, holding that an employee's dissatisfaction with an

employer's efforts to find coverage did not negate that offering shift

swapping itself was a reasonable accommodation. *Id.*

---

[7] Of course, there are cases where the parties dispute material facts, and in those cases summary judgment is inappropriate. *See, e.g., Tabura v. Kellogg USA*, 880 F.3d 544, 555-57 (10th Cir. 2018) (parties disputed the degree to which the employer limited shift swapping by assigning employees to "crews" and only permitting swapping with limited other crews); *Antoine v. First Student, Inc.*, 713 F.3d 824, 837 (5th Cir. 2013) (parties disputed whether the employee had been notified that he was permitted to swap shifts); *EEOC v. Robert Bosch Corp.*, 169 F. App'x 942, 945 (6th Cir. 2006) (parties disputed whether the employer actually permitted shift swapping). But these cases do not negate the general rule—shift swapping is a reasonable accommodation. Moreover, here the parties do not dispute the material facts. Both Groff and the USPS filed motions for summary judgment asserting that the material facts were undisputed.

[8] Here, the parties agree that the USPS facilitated shift swapping.

Further, Title VII requires "bilateral cooperation" to reach a reasonable accommodation. *Ansonia*, 479 U.S. at 69. For this reason, when an employer permits shift swapping as an accommodation, the employee has an obligation to try to find coverage. *See Bush v. Regis Corp.*, 257 F. App'x 219, 221-22 (11th Cir. 2007); *see e.g., Patterson v. Walgreen Co.,* 727 F. App'x 581, 586-87 (11th Cir. 2018) (affirming summary judgment for the employer when the employee called only one potential volunteer to cover a sabbath training); *United States v. City of Albuquerque*, 545 F.2d 110 (10th Cir. 1976) (affirming summary judgment for the employer when the employee made no efforts to find coverage).

Groff now urges the Court to carve out a new exception to the general rule that shift swapping constitutes a reasonable accommodation.[9] (Appellant's Br. at 33-37.) He suggests that shift

---

[9] Two narrow exceptions have been recognized by circuit courts, but neither applies here. *See Robert Bosch Corp.*, 169 F. App'x at 944-45. First, shift swapping may be an insufficient reasonable accommodation for an employee whose religious beliefs forbid him from asking someone else to work on the sabbath. *See, e.g., Smith v. Pyro Min. Co.*, 827 F.2d 1081 (6th Cir. 1987) (per curiam) (employee believed it was a sin for him to ask a volunteer to work for him). Groff does not argue that the USPS finding coverage for him would violate his religious beliefs.

swapping is only a reasonable accommodation when a volunteer is always found. Other employees have advanced this argument and failed. *See, e.g., Miller v. Drennon*, No. 91-2166, 1992 U.S. App. LEXIS 14449, at *9 (4th Cir. June 19, 1992) (employer offered a reasonable accommodation even though other employees sometimes declined to cover shifts); *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 591 (11th Cir. 1994) (employer offered a reasonable accommodation even though shift swapping was only twice successful). As one court noted, "[g]uarantees are not required." *Patterson,* 727 F. App'x at 587.

The decisions Groff relies on are inapposite and do not support his argument that shift swapping is only a reasonable accommodation when it works perfectly. (Appellant's Br. at 34.) In *Crider*, the employer failed to offer shift swapping, instead simply scheduling the employee

---

Second, shift swapping may be an insufficient reasonable accommodation when the employer frustrates efforts to find coverage. *See, e.g., Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 F. App'x 822, 830 (11th Cir. 2020) (employer unreasonably limited the class of possible volunteers); *Crider*, 492 F. App'x at 615 (employer frustrated, inhibited, or impeded the employee's efforts to swap shifts); *McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 610 (6th Cir. 1992) (employer discouraged other employees from swapping). The evidence is to the contrary here. The USPS facilitated, not frustrated, coverage for Groff.

for fewer sabbath shifts. In addressing this so-called accommodation, *not* shift swapping, the *Crider* court held that that "unobjectionable shift exchanges" may constitute "[r]easonable accommodations for religious convictions" but that simply scheduling the employee less often did not. 492 F. App'x at 612-13.

Nor did the district court in *Miller v. Port Auth. of N.Y. & N.J.*, find that shift swapping must be perfect to be a reasonable accommodation. (Appellant's Br. at 34-35.) To the contrary, the district court concluded that "voluntary swapping of shifts can constitute a reasonable accommodation in the context of a neutral rotating shift system." 351 F. Supp. 3d 762, 781 (D.N.J. 2018). Ignoring this language, Groff focuses on the district court's comment that an "entirely fruitless swap arrangement . . . might fall short of a reasonable accommodation." (Appellant's Br. at 34-35.). By example of a "fruitless swap arrangement," the *Miller* district court points to *Tabura*, where the employer so drastically curtailed the number of employees permitted to swap shifts that the employer functionally thwarted the employee's efforts to find coverage. 880 F.3d at 555. The undisputed facts here are

easily distinguished; any carrier could cover for Groff and the USPS itself facilitated finding coverage.

The other cases Groff cites are equally inapplicable. (Appellant's Br. at 35-37.) The accommodation was unreasonable in *Cooper v. Oak Rubber Co.*, because the employer only permitted the Sabbatarian employee to swap the Saturday day shift for the Friday night shift, and the Friday night shift still necessitated some work on the sabbath. 15 F.3d 1375, 1379-80 (6th Cir. 1994). Here the USPS created a system wherein Groff's entire Sunday shift could be swapped.

Nor does *Brener* support Groff's argument. (Appellant's Br. at 33-36.) An accommodation was found reasonable in *Brener*, where the facts suggested it was the employee's own lack of diligence that led to his inability to find coverage. 671 F.2d at 145-47. Here, the USPS facilitated efforts to find coverage for Groff. If anything, the *Brener* holding suggests Groff had more of an obligation to bilaterally cooperate than he demonstrated here.

Nor does *EEOC v. Arlington Transit Mix, Inc.* support Groff's argument. (Appellant's Br. at 36-37.) This case didn't even involve shift swapping. Rather, after years of allowing the employee to leave early to

29

attend church the employer told the employee he would have to wait and see each week whether the work was completed in time for him to attend services. 957 F.2d 219, 221 (6th Cir. 1991). That "wait and see approach," not shift swapping, was deemed unreasonable. The USPS did nothing of the sort here.

Groff does not cite a single case that stands for the rule he now asks the Court to announce—that shift swapping is only a reasonable accommodation when it works flawlessly, and a replacement employee is always willing to cover. Nor does he cite a single case where an employer offered shift swapping, facilitated it, and the court nonetheless held that the employer failed to meet its burden to reasonably accommodate the employee. Rather, the cases Groff cites support the USPS's argument because they demonstrate that the USPS went beyond what was required.

It is undisputed that the USPS not only permitted shift swapping but facilitated it for Groff. The law is clear—this is a reasonable accommodation. It was approved in *Hardison* and that case controls. The fact that there were times no volunteers were willing to swap shifts does not change this. The USPS had an obligation to offer a reasonable

accommodation and Groff had a bilateral obligation to cooperate. Offering shift swapping, which would mean that any Sunday Groff was scheduled he could alleviate any need to work by finding an employee to cover, was sufficient. But here, the USPS did more. It not only allowed swapping, but actively solicited coverage for Groff.

Groff may be displeased that other employees sometimes declined to cover for him, but that is legally insufficient. No court has ever held that shift swapping is only a reasonable accommodation when, in practice, it works perfectly. The cases Groff cites do not go this far. Neither does *Hardison*. A reasonable accommodation was offered by the USPS. The Court need analyze no further and should affirm the district court's entry of summary judgment for the USPS on this basis.

## B. Title VII did not require the USPS to offer further accommodations.

As noted, the USPS offered Groff shift swapping. The USPS thereby met its burden under Title VII. Although Groff now urges this Court to interpret Title VII to require more, it should decline to do so.

Title VII provides in relevant part that "it shall be an unlawful employment practice for an employer [] to . . . discharge any individual . . . because of such individual's . . . religion. . . ." 42 U.S.C. § 2000e-

2(a)(1). When Congress amended Title VII in 1972, it added the

following definition of "religion:"

> The term "religion" includes all aspects of religious
> observance and practice, as well as belief, unless an employer
> demonstrates that he is unable to *reasonably accommodate* to
> an employee's. . . religious observance or practice without
> undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j) (emphasis added).[10] The intent of the amendment

was to reflect a balance between the employer's and employee's

respective needs. *See Hardison*, 432 U.S. at 74. The plain language of

Title VII is unambiguous—an employer need not wholly eliminate a

conflict between work and religion for an accommodation to be

reasonable. But if the Court finds the language to be ambiguous,

Congressional intent supports the same conclusion.

---

[10] The duty to reasonably accommodate originated in 1966 EEOC
guidelines. *See* 29 C.F.R. § 1605.2(b). Congress then grafted this duty
into Title VII when it amended the statute in 1972. As part of the same
amendment, Congress extended Title VII's protection to federal
employees. 42 U.S.C. § 2000e-16. *See also Brown v. Gen. Servs. Admin*,
425 U.S. 820, 829 (1976).

### 1. Under the plain language of Title VII, a conflict need not be wholly eliminated for an accommodation to be reasonable.

Title VII does not define "reasonable accommodation" as a term of art. *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 225 (3d Cir. 2000). Although the Supreme Court has not defined this term, it has noted that Title VII's objective is to "eliminate the conflict between employment requirements and religious practices," but that an employer need not "accommodate at all costs." *See Ansonia*, 479 U.S. at 70.[11]

The USPS and Groff offer two different interpretations. The USPS suggests a flexible interpretation—what is a reasonable accommodation

---

[11] A circuit split has arisen with half the circuits adopting the USPS's plain language interpretation and half grafting a "complete elimination" standard onto Title VII. *Compare Sánchez-Rodriguez*, 673 F.3d at 12 (endorsing the interpretation the USPS suggests here); *Firestone,* 515 F.3d at 313-14 (same); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 502 (5th Cir 2001) (same); *Sturgill*, 512 F.3d at 1030-31 (same); *Tabura*, 880 F.3d at 552 (same) *with Baker v. Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006) (endorsing the interpretation Groff suggests here); *Cooper*, 15 F.3d at 1378 (same); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997) (same); *Opuku-Boateng*, 95 F.3d at 1467 (same); *Walden v. Ctrs. For Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) (same).

depends on the specific circumstances. Groff offers a rigid definition—only the complete elimination of all conflicts between work and religion is an accommodation. (Appellant's Br. at 19-25.) Groff's isolated and narrow definition of "accommodation" finds no basis in the plain language of Title VII. The USPS's definition, on the other hand, is grounded in section 2000e(j). The Court must start there.

> a. *The Court should focus on the term "reasonably accommodate," rather than the term "accommodate" in isolation.*

The starting point of any statutory interpretation is the plain language of the statute itself. *United States v. James*, 478 U.S. 597, 604 (1986). There is a "strong presumption" that Congress intended the "ordinary meaning" of the words it uses in a statute. *Ardestani v. INS*, 502 U.S. 129, 135-36 (1991).

The parties disagree as to what language the Court should focus on. Groff focuses almost exclusively on the term "accommodation" whereas the USPS urges the Court focus on the entire term "reasonably accommodate." (Appellant's Br. at 20-21.) The USPS has good reason for focusing on the entire term "reasonably accommodate." Congress was precise in its language. It did not simply call for any "accommodation" in the abstract. Nor did it call for a "complete," "total," or "perfect"

accommodation, as Groff may wish it had. Rather, Congress called for a "reasonable" one.

Groff's interpretation requires the Court to sever the interpretation of what is an "accommodation" from the interpretation of what is "reasonable." (Appellant's Br. at 20-24.) In essence, he asks the Court to evaluate each word in isolation. *Id.* This is not how statutory interpretation should be done. *See Boys Mkts., Inc. v. Retail Clerk's Union*, 398 U.S. 235, 250 (1970). Adjectives modify nouns; adverbs modify verbs. *See Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019); *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018). The modifier cannot be ignored. The Court's proper focus is on what Congress intended by the term "reasonably accommodate" and not more narrowly what the term "accommodate" means in a vacuum. *See James*, 478 U.S. at 604.

If Congress meant for the term "accommodate" to be unlimited, as Groff suggests, it would have used no adverb. By using the adverb "reasonably," Congress limited the term "accommodate" to less than all possible accommodations. Within the greater category of accommodations is a subset that are reasonable. This subset are the

only accommodations an employer need offer. The term "reasonable accommodation," read as a term of art, shows that the standard is a flexible, not rigid one.

> b. *As "reasonable accommodation" is judged on a flexible sliding scale, even accommodations that do not completely eliminate the conflict between work and religion can be reasonable accommodations.*

The Court's proper focus is on what Congress intended by the term "reasonably accommodate" and therefore what Congress intended "reasonable" (the root of "reasonably") to mean. "Reasonable" means something less than "complete," "total," or "perfect." Black's Law Dictionary defines "reasonable" as "fair, proper, or moderate under the circumstances," or "sensible." Black's Law Dictionary (11th ed. 2019). Similarly, Merriam Webster's dictionary defines "reasonable" as "not extreme or excessive" as well as "moderate" and "fair." Merriam-Webster Third New International Dictionary (2020).

When used in other legal phrases, such as "reasonable doubt," "reasonable suspicion," or "reasonably prudent person," the term is

given a similar meaning.[12] By its very definition, the term "reasonable" is not absolute. The term itself requires a sliding scale. "Reasonable doubt" is some degree of doubt between complete disbelief and absolute certainty. "Reasonable suspicion" is some degree of suspicion between total distrust and certain trust. "A reasonably prudent person" exercises some degree of care between wholesale disregard and complete perfection. It therefore stands to reason that a "reasonable accommodation" lies somewhere between making zero effort to address the employee's conflict and completely eliminating it.

With this understanding of the function of the term "reasonable," the Court must then consider what constitutes "reasonable

---

[12] Groff analogizes to the phrase "reasonably deliver." This is a poor analogy because unlike doubt, suspicion, or prudence, delivery is not a matter of degree. There are no shades of gray when it comes to whether a package is delivered—this is a binary concept. There are, however, shades of gray when it comes to whether a juror has doubt, whether law enforcement has suspicion, or whether a plaintiff acts prudently. Similarly, there are shades of gray when it comes to an accommodation. This case illustrates exactly those shades of gray. Permitting an employee to come in after church services on a Sunday is a reasonable accommodation for a non-Sabbatarian. It may not be reasonable for a Sabbatarian. This is why reasonableness must be a fact-specific, sliding scale inquiry. This was precisely the Court's reasoning in *Geo Grp.*, 616 F.3d at 271.s

accommodation," applying the adjective "reasonable" to the noun "accommodation."

The term "accommodation" has been defined in the context of disability discrimination to mean changes to an employer's "ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *See Burch v. Coca-Cola Co.*, 119 F.3d 305, 314-15 (5th Cir. 1997); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995). Dictionaries characterize the term similarly, defining it as "something supplied for convenience or to satisfy a need" or "an adaptation" or an "adjustment." Merriam-Webster Third New International Dictionary (2020).

Groff's suggested accommodation—that he be skipped every Sunday—is not an accommodation at all. It does not modify, adapt, or adjust his job duties. It rewrites the job of an RCA. As an RCA, an essential function of Groff's job was to be available to carry the mail on any day of the week when the USPS offered delivery. This included Sundays. Eliminating all Sunday work would radically change the essential function of an RCA. Title VII does not require an employer to

give an employee like Groff a brand new, idiosyncratic job. Such a demand is neither an accommodation nor is it reasonable.

Read as a term, a "reasonable accommodation" is an adaptation or adjustment to an employer's ordinary work requirements that is fair when viewed in the fact-specific context of the employee's workplace and employer's organizational needs. Even a modification that fails to wholly eliminate a conflict, but that still makes sense given the employer's business needs, can constitute a "reasonable accommodation." It need not be perfect; it need only be reasonable.[13]

The Supreme Court endorsed the same interpretation of the similar term "reasonable modification" in the context of another anti-discrimination statute, the Rehabilitation Act of 1973. In *Southeastern Cmty. Coll. v. Davis*, the Court held that a nursing program was entitled to deny entry to a deaf applicant because eliminating the

---

[13] Title VII only requires that an employer offer a reasonable accommodation; it does not require that an employer choose a particular accommodation requested by an employee. *See Ansonia*, 479 U.S. at 62. This is especially true where, as here, the purported reasonable accommodation suggested by the employee was neither reasonable nor an accommodation.

conflict between the structure of the program and the applicant's disability was not reasonable when the specific facts were considered. 442 U.S. 397, 412-413 (1979). Just as the USPS urges here, the Court interpreted "reasonable" as a modifier that required something less than complete modification. The Court read the term of art as a whole. Just as the USPS urges here, this modifier required a fact-specific, flexible analysis rather than a bright line rule.

Groff contends that nothing satisfies the definition of "accommodation" under Title VII unless it is a complete accommodation, with employers constrained to choose only "from among the options that wholly eliminate the conflict between work and religion."[14] (Appellant's Br. at 22.) Such a reading is unsupported by Title VII. If Congress had meant "choose from available options" that "wholly eliminate the conflict," it would have said so. It didn't. Congress's choice of words is presumed to be deliberate. *Univ. of Tex.*

---

[14] Certainly if multiple reasonable accommodations are possible, and only one completely eliminates the conflict, the employer should choose that one. But that does not mean that an accommodation must fully eliminate the conflict to be reasonable.

*Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). Groff concedes that a statute should be read to give all words meaning, yet his reading makes the term "reasonably" superfluous. Under his interpretation, an accommodation means complete elimination of the conflict and anything less is unreasonable. This reads the term "reasonably" out of Title VII. The more flexible reading suggested by the USPS better aligns with Title VII's overall statutory scheme.

### c. *A flexible reading aligns with the overall statutory scheme of Title VII.*

The USPS's definition comports with the overall statutory scheme of Title VII, and in particular with section 2000e(j). In this section of the statute, Congress eschewed absolutes, recognizing that there is a need to balance an employer's business needs with an employee's religious beliefs. In the very section where Congress required an employer offer a reasonable accommodation, it further limited this requirement to circumstances where the employer would suffer no "undue hardship."

Even the term "undue hardship" is flexible. Congress did not draw the line at any specific hardship but rather created a flexible standard whereby some degree of hardship overcomes the entitlement to an accommodation. The Supreme Court recognized this flexibility in

*Hardison*, noting "the statute provides no guidance for determining *the degree* of accommodation that is required of an employer. 432 U.S. at 74-75 (emphasis added). Throughout Title VII, the balance of equities is non-binary. It is always a matter of degree.

Flexibility pervades section 2000e(j). On the one hand, Congress's "principal goal" in Title VII is "to eliminate discrimination in employment." *See Hardison*, 432 U.S. at 71 n.6. And Groff is correct that "Title VII gives favored treatment to religious practices" as compared to non-religious practices. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031 (2015). But what Congress did not do is elevate the religious needs of the employee above the business needs of the employer and other employees. The employer's needs are considered both at the accommodation stage, in the form of reasonableness, and also at the hardship stage, in the form of what is undue.[15] Inherent in each stage of the analysis is the balance which motivated Congress to amend Title VII.

_____

[15] The EEOC, in its guidance, suggests that it would consider the reasonableness of accommodations that do not wholly eliminate the conflict at the undue hardship stage. *See* EEOC-CVG-2021-3, Section 12: Religious Discrimination, available at

42

Congress recognized the need for a balance between the employee's religious need and the employer's need to run its business. *See Ansonia*, 479 U.S. at 70. Both the term "reasonable accommodation" and the term "undue hardship" reflect flexible guideposts rather than rigid extremes. This is also apparent in the requirement for bilateral cooperation, which Groff himself acknowledges. (Appellant's Br. at 23, 28.) There can be no bilateral cooperation when the employer must give all and the employee must give none. Reading the term "accommodation" in isolation, to require absolute acquiescence to the employee's wishes, is fundamentally inconsistent with section 2000e(j) and Title VII as a whole. There are no absolutes here. Moreover, the flexible reading suggested by the USPS harmonizes section 2000e(j) with the similar language of another anti-discrimination statute, the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* (the "ADA").

---

https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref233 (last visited August 26, 2021). Not only is this guidance non-binding by its own terms, but even if the Court were to apply it here, it would find that skipping Groff on Sundays posed an undue burden. The reasoning would be different but the outcome would not be—the district court below should still be affirmed.

### d. A flexible reading harmonizes Title VII's language with the nearly identical language in the ADA.

Although the Supreme Court has not directly addressed the question posed herein, it has interpreted a similar provision in a similar antidiscrimination statute and concluded that "reasonable" does not mean "complete," "total," or "perfect." In *US Airways, Inc. v. Barnett,* the Court interpreted a linguistically similar provision of the ADA. 535 U.S. 391, 399-402 (2002). Like Title VII, the ADA also requires "reasonable accommodations" absent "undue hardship." In section 12112(b)(5)(A), Congress defined discrimination to include:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A). The *US Airways* Court began its analysis of this language by rejecting the very argument Groff makes now—noting "[f]or one thing, in ordinary English the word 'reasonable' does not mean 'effective.'" 535 U.S. at 400. Rather than interpret the term "reasonable accommodations" to completely eliminate the conflict between an employee's disability and an employer's business

44

necessities, the Court interpreted it to require something less. There is little reason to believe Congress meant something different in the ADA and Title VII when it used not only nearly identical language but the same balancing of interests in both statutes. Moreover, the reading suggested by the USPS is not only consistent with the Supreme Court's decision in *US Airways* but also with its decisions in *Ansonia* and *Abercrombie & Fitch*.

   e. *Neither* Ansonia *nor* Abercrombie & Fitch *supports a contrary interpretation.*

   Groff's argument to the contrary largely relies on a misreading of the Supreme Court's decision in *Ansonia* and his selective reliance on language from the inapposite case of *Abercrombie & Fitch*. *See Abercrombie & Fitch*, 135 S. Ct. at 2028; *Ansonia*, 479 U.S. at 60.  The *Ansonia* Court concluded that "requiring respondent to take unpaid leave for holy day observance" would be a reasonable accommodation if applied in a religion-neutral manner because "[t]he provision of unpaid leave eliminates the conflict between employment requirements and religious practices." 479 U.S. at 70. Therefore, an accommodation is reasonable as a matter of law if it eliminates a religious conflict. That does not make the reverse true, however. The *Ansonia* Court neither

45

held nor even suggested that an accommodation, to be reasonable as a matter of law, must eliminate any religious conflict. This is the logical fallacy known as "denying the antecedent" or "fallacy of the inverse." *See NLRB v. Canning*, 573 U.S. 513, 588-89 (2014).

Nor does *Abercrombie & Fitch* support Groff's interpretation of "reasonably accommodate." The *Abercrombie & Fitch* decision did not involve any statutory interpretation of section 2000e(j). Rather, the Court concluded that the employer's failure to hire a Muslim employee based upon a perception that she would need an exemption from the employer's dress code was religious discrimination. The *Abercrombie & Fitch* Court declined to "add words to the law" to find for the employer—yet here Groff asks the Court to read the concept of complete elimination into section 2000e(j), and the concept of undue hardship out of it. 135 S. Ct. at 2033.

### 2. Congress did not intend a complete elimination standard in Title VII.

Where the plain language is clear, as it is here, the Court need look no further. Legislative history cannot be used to muddy clear statutory language. *See Milner v. Dep't of the Navy*, 562 U.S. 562, 572

(2011). Here, however, the legislative history of Title VII supports the USPS's interpretation of section 2000(e)(j).

Title VII's evolution is instructive of Congress's intent. Title VII's original language contained no concept of a reasonable accommodation. Rather, it simply prohibited religious discrimination. Congress amended the statute in 1972 to include the language at issue here. Senator Jennings Randolph, who sponsored the amendment, explained its purpose. He stated that it was "his hope that accommodation be made with 'flexibility' and 'a desire to achieve an adjustment.'" 118 Cong. Rec. 706 (1972) (statement of Senator Randolph). He made no mention of perfection or of the need to "completely eliminate" a conflict. His emphasis on "flexibility" is at odds with any reading of section 2000(e)(j) that would require complete acquiescence to an employee's request.

The EEOC agrees. In its guidance, the EEOC notes that:

> Ultimately, reasonableness is a fact-specific determination. The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead, it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another . . . . "The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning. Each case . . . necessarily depends upon its

47

> own facts and circumstances, and comes down to a
> determination of 'reasonableness' under the unique
> circumstances of the individual employer-employee
> relationship.

EEOC-CVG-2021-3, Section 12: Religious Discrimination, available at

https://www.eeoc.gov/laws/guidance/section-12-religious-

discrimination#_ftnref233 (last visited August 26, 2021) (citations

omitted). Flexibility is still inherent in the EEOC's interpretation of the

term.

Here, the Court should reject Groff's invitation to adopt the total

elimination standard. Such a reading of Title VII comports with neither

its plain meaning nor its legislative intent.

But even if the Court were to adopt this standard, it would

nonetheless affirm the district court's entry of summary judgment. The

USPS offered Groff an accommodation that totally eliminated any

conflict between his Sabbatarian beliefs and his work schedule. On any

Sunday that Groff was scheduled, another employee could cover his

whole shift. Groff would get the entire sabbath off. He would face no

conflict between work and religion. This is a "complete elimination."

Groff focuses on the empirical application of the accommodation

rather than what was actually offered. By this measure, no

accommodation could ever meet Title VII's standard because some intervening event could always intercede to prevent an accommodation from working perfectly in practice. Nowhere does the text of Title VII suggest an accommodation should be measured empirically with hindsight. Rather, the focus on what accommodation was offered. Here, at the time shift swapping was offered, this accommodation was capable of wholly eliminating the conflict.[16]

The district court below properly concluded that the USPS offered Groff a reasonable accommodation. On this basis, the Court should affirm entry of summary judgment in favor of the USPS.

## II.    The USPS demonstrated that further accommodations would constitute an undue hardship.

Because the USPS reasonably accommodated Groff, the Court need not consider whether additional accommodations would be an undue hardship. However, the district court also properly concluded that additional accommodations would cause an undue hardship—an

---

[16] Had Groff sought to find his own coverage, or been more willing himself to cover shifts for other carriers, perhaps more volunteers would have agreed to swap shifts with him.

independent reason it granted judgment for the USPS and an independent ground on which this Court can affirm.

An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees but is not required to incur undue hardship in doing so. *See Geo Grp.,* 616 F.3d at 273. As with "reasonable accommodation," the "undue hardship" analysis requires a balance between the employer and employee's respective needs. Undue hardship exists, as a matter of law, when an employer would be required to bear more than a *de minimis* cost to accommodate the employee. *Hardison*, 432 U.S. at 84. Both economic and non-economic costs are considered. *Geo Grp.*, 616 F.3d at 273. The employer need not actually incur the hardship. *Firestone*, 515 F.3d at 317; *Beadle*, 42 F.3d at 633. The threshold is low. *See Webb*, 562 F.3d at 256-260; *United States v. Bd. of Educ. for Sch. Dist.*, 911 F.2d 882, 890 (3d Cir. 1990). Here, the USPS demonstrated numerous costs that exceed the *de minimis* threshold. This includes violation of a collectively bargained agreement, an undue hardship deemed sufficient in *Hardison*. The inquiry can end there.

Perhaps realizing that his claim fails under prevailing law, Groff now invites the Court to disregard *Hardison*. (Appellant's Br. at 50-52.) This Court should decline this invitation. Doing so would improperly substitute this Court's judgment for that of Congress and violate the Supreme Court's directives to Courts of Appeals when confronted with Supreme Court authority.

## A. The USPS demonstrated multiple hardships that exceed the *de minimis* threshold.

The USPS demonstrated numerous hardships that exceed the *de minimis* threshold. Most notably, further accommodations would have violated a collectively bargained agreement. In addition, further accommodations would have required either straining other employees, expending overtime, or jeopardizing the success of the Amazon contract. Any one of these hardships has been separately deemed to exceed the *de minimis* threshold. Given that Groff did not dispute any of the USPS's evidence as to the hardship posed by further accommodation, these facts should be credited and are sufficient to prove undue hardship. The inquiry as to undue hardship can end there. On this basis, the Court should affirm the entry of summary judgment in favor of the USPS.

### 1. Excusing Groff from Sunday work would violate a collectively bargained agreement.

Excusing Groff from Sunday work would violate the MOU, a collectively bargained agreement. Violating a collectively bargained agreement is an undue hardship.

The Supreme Court addressed this very issue in *Hardison*, holding that an accommodation that requires the employer to violate a collectively bargained agreement is an undue hardship. 432 U.S. at 79-81. In *Hardison*, the employer utilized a collectively bargained seniority system for scheduling shifts. 432 U.S. at 67. More senior employees bid on more desirable shifts, leaving less-senior employees to fill in as needed. *Id*. Although he lacked seniority, the Sabbatarian employee in *Hardsion* requested that he be exempt from working on Saturday so he could observe the sabbath as a day of rest. *Id*. at 66-68. To assign the Sabbatarian employee this shift, the employer would have had to bypass more senior employees who had a right to choose their shifts before the Sabbatarian employee did. *Id*. at 68-69. The *Hardison* Court concluded that Title VII did not require the employer to prejudice other employees to accommodate the Sabbatarian employee. *Id*. at 81. The Court noted, as Groff does, that seniority systems are exempt from Title

VII. It did not, however, conclude that only seniority systems are so exempt. Groff again commits the fallacy of the inverse.

At issue in *Hardison* was an agreement that happened to be both collectively bargained and to involve seniority, but the Court's holding was broader. The Court broadly held that an employer was not required to infringe on one employee's contractual rights to accommodate another employee. The *Hardison* Court discussed not only the validity of seniority systems more narrowly but also the importance of collective bargaining generally, noting that such bargaining "lies at the core of our national labor policy." *Id*. at 79. As the Court noted:

> it would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of *some employees*, as well as deprive them of their *contractual rights*, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

*Id*. at 81 (emphasis added). The Court's language was clear—the rights of an employee with a religious conviction cannot trump the contractual rights of other employees. *Id*. This is true whether those contractual rights involve seniority or not.

Following *Hardison*, circuit courts have agreed that an employer need not skip one employee with a religious objection to working on a particular day if doing so would violate a collectively bargained agreement. *See, e.g., Mann v. Frank*, 7 F.3d 1365, 1369 (8th Cir. 1993) (affirming a finding of undue hardship where a Sabbatarian employee's request to be skipped on the sabbath would have deprived a fellow employee of her contractual right to refuse to work); *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 520-21 (6th Cir. 2002) (affirming a finding of undue hardship where skipping an employee in the rotation would violate a collectively bargained agreement). This Court has not departed from this reasoning. *See Getz v. Pa. Dep't of Pub. Welfare*, 802 F.2d 72, 74 (3d Cir. 1986) (declining to require an employer violate a collectively bargained agreement to accommodate an employee where the accommodation would violate the provisions relating to overtime *and* seniority).[17]

-------------------

[17] Under a collectively bargained agreement, the employee in *Getz* was entitled to a fixed number of days of leave. 802 F.2d at 73. She sought to accrue ten additional days for religious observance. *Id.* Although there was no issue relating to seniority in the case, the Court nonetheless applied the *Hardison* test and held that the employer was not required to violate the collectively bargained agreement to

Here, there is no dispute between the parties. The MOU was a collectively bargained agreement. Per the agreement, which was negotiated by the union representing RCAs like Groff, all RCAs who did not want to work on holidays and Sundays were to be scheduled pursuant to a rotation. There were a few narrow exceptions recognized by the MOU but none were applicable to Groff. If USPS management skipped Groff's name in the rotation when it came up on a Sunday, the USPS violated the MOU. This was true whether the USPS scheduled another carrier to cover or whether the USPS made do with short staffing instead. The mere act of skipping Groff would have violated the MOU. Therefore, any accommodation that required he be skipped would constitute more than a *de minimis* impact and an undue burden. The facts of this case are analogous to *Hardison* and a similar outcome is warranted here.

---

accommodate the employee. *Id*. at 74. Groff is incorrect when he asserts that no court has held that the *Hardison* test applies to a fact pattern that did not involve issues of seniority. (Appellant's Br. at 42.) The Court has itself applied *Hardison* to such a fact pattern.

Groff now tries to distinguish *Hardison*, arguing that its holding applies only to collectively bargained seniority agreements. (Appellant's Br. at 39-44). Such an argument cannot be squared with *Hardison*'s language, which reveals that the *Hardison* Court did not intend to limit its holding exclusively to seniority provisions. Rather, the Court recognized the importance of collective bargaining agreements generally, as well as the costs, both economic and non-economic, that would be imposed by selective breaches of these agreements.

But even if *Hardison*'s holding is correctly so narrowly viewed, the MOU can be seen as a form of a seniority agreement. The MOU creates a system for the scheduling of part-time, relief carriers so that regular carriers with more seniority do not have to work on holidays and Sundays. In the small Holtwood station, skipping Groff on Sundays would leave few options. One was to force the only other RCA to work every Sunday. As discussed in section II.B.2. below, this was an undue hardship. But the other options would also violate collectively bargained seniority agreements. If Postmaster Hess forced a regular carrier to cover the shift that would have violated the seniority rights of this more regular carrier. If Postmaster Hess himself delivered the

56

packages, he also would have violated a collectively bargained agreement applicable to regular carriers.

Violating the MOU was an undue hardship as a matter of law. On this basis, the district court's decision below should be affirmed.

### 2. The USPS demonstrated at least four additional undisputed hardships.

Although the USPS was only obligated to show one type of undue hardship, and it amply met this burden by showing that skipping Groff on Sundays would violate the MOU, the USPS showed at least four other hardships.

First, the USPS showed that skipping Groff on Sundays would result in fewer days off for the other RCAs. An accommodation that deprives employees of their equal share of time off is an undue hardship. *See, e.g., Crider,* 492 F. App'x at 614; *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 275 (5th Cir. 2000) (affirming a finding of undue hardship where an accommodation would decrease the amount of rest and time off other employees enjoyed); *Lee v. ABF Freight System, Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994) (affirming a finding of undue hardship where the accommodation would alter other employees' time off). The rationale underlying this conclusion is simple—Congress did

not intend an employer to discriminate against one employee to accommodate another. *See Hardison*, 432 U.S. at 85.

Here, simple math demonstrates that if Groff was skipped on every Sunday during peak season, all the other RCAs would have their name come up in the rotation more often. He would get more time off, and they would get less time off. The result is an undue burden—skipping Groff in the rotation would have resulted in the USPS discriminating against his fellow RCAs.

The situation in Holtwood was even more dire. At times there was only one other RCA in that station. JA 39 ¶62. If Groff was excused from all Sunday work, that would mean the other RCA would have to work every single Sunday without ever taking a Sunday off. JA 38 ¶54.

Second, the USPS showed that skipping Groff on Sundays would have increased the USPS's overtime costs. JA 38 ¶55. As this Court recognized in *Protos v. Volkswagen of Am., Inc.*, an accommodation that requires an employer to pay premium time is an undue hardship. 797 F.2d 129, 135 (3d Cir. 1986), *cert. denied*, 479 U.S. 972 (1986). In *Protos*, there was no evidence that the employer would have had to pay overtime to cover the employee's sabbath shifts, but the Court noted in

58

dicta that such payment could have provided evidence of undue hardship. Other circuit courts agree. *See, e.g., Crider,* 492 F. App'x at 614 (2012); *Creusere v. Bd. of Educ. of the City Sch. Dist. of Cincinnati,* 88 F. App'x 813, 819 (6th Cir. 2003); *Brener,* 671 F.2d at 146; *Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir. 1999).

Here, Postmaster Hess's testimony was clear—when Groff did not work on Sundays it caused overtime at the Holtwood station. JA 38 ¶55. Even if it was only at Holtwood during peak season, the record supports a conclusion that skipping Groff caused the USPS to expend premium pay. Groff's focus on the testimony of Deborah Gless is, as the district court held, "irrelevant."[18] JA 30 n. 3. An employer need not monetize its hardship, it need only articulate a future hardship it may incur. The

---

[18] Groff asked the district court to strike all evidence of undue hardship to the USPS based on Gless's testimony that she, as the USPS's designee pursuant to Fed. R. Civ. P. 30(b)(6), could not identify the hardship that was caused to the USPS by skipping Groff in the Sunday schedule. Groff's argument was contrary to law. *See, e.g., State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.,* 250 F.R.D. 203, 212 (E.D. Pa. 2008), *citing, inter alia,* 8A Charles Alan Wright *et al.,* Federal Practice and Procedure § 2103 (Supp. 2007) (Rule 30(b)(6) deposition testimony is not a judicial admission). The district court denied Groff's request as "neither supported by the facts of record nor the Rules of Civil Procedure," JA 31 n.4, and Groff has not appealed that ruling.

USPS has done so here. Skipping Groff on Sundays did increase overtime, and that is an undue hardship.

Third, the USPS showed that skipping Groff on Sundays would have led to more dangerous conditions for other carriers working that day. An accommodation that requires other employees to shoulder more than their share of dangerous work is an undue hardship. As this Court noted in *Geo Grp.*, "[a] religious accommodation that creates a genuine safety or security risk can undoubtedly constitute and undue burden . . ." 616 F.3d at 273. Other circuit courts have agreed. *See, e.g., Balint*, 180 F.3d at 1054 (rejecting that other employees should be required to work Friday and Saturday shifts—when the most "dysfunctional arrests" tended to occur).

Here, the packages had to be delivered on a Sunday with or without Groff. When he was absent and there was no coverage, that meant the carrier who reported to work had to work longer to get the packages delivered. JA 38 ¶53. Delivering in the dark increased the danger for the other carriers who faced increased odds of injury as they walked from their vehicles to leave packages at the door of USPS customers. JA 124-125. Exposing other employees to more dangerous

work conditions is an undue hardship. In addition to the dangers posed to the employees themselves, the more dangerous the job becomes, the more exposure the USPS has for work-related injuries by its employees.

Fourth, the USPS demonstrated that skipping Groff on Sundays impacted morale to a degree that it harmed the operation of the USPS. JA 38 ¶¶51-56, JA 459, JA 491. Groff is correct that Title VII focuses on impacts to the employer and not other employees. (Appellant's Br. at 47-48). However, impacts to other employees can negatively affect the employer's operations. "Chaotic personnel problems" are an undue burden. *See Crider,* 492 F. App'x at 614; *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975). An accommodation that creates employee dissatisfaction that impacts the employer's business is an undue hardship. For this reason, the Court in *Protos* affirmed the district court's finding of an undue burden where the court was persuaded that offering an accommodation would have decreased the efficiency of the workforce. 797 F.2d at 134-35. Other circuit courts agree. *See, e.g., Crider,* 492 F. App'x at 614 (holding that a single employee's threat to quit was sufficient to constitute an undue hardship where losing that employee would leave only one other to do the work);

61

*Draper*, 527 F.2d at 521 (holding that it "is conceivable that employee morale problems could become so acute that they would constitute an undue hardship" but finding insufficient evidence of such problems on the record before the court); *Brener*, 671 F.2d at 146-47 (noting that forcing other employees to cover shifts lowered morale to the point where it disrupted work routines).

Here, the undisputed evidence showed that other employees were upset when Groff did not work on Sundays. JA 38, ¶51. One RCA who covered voluntarily for Groff all peak season long transferred out of the Holtwood station, leaving Postmaster Hess to try to hire a replacement. *Id*. His stated reason for leaving was that Groff was excused from Sunday work. *Id*. It is irrelevant, as Groff argues, that peak season at Holtwood lasted only a few weeks—Groff's absence had a major impact on the station's staffing going forward. (Appellant's Br. at 50.) There were often only two RCAs there. JA 39 ¶62. If Groff had to be skipped, that meant the other RCA always had to work all Sundays. JA 38 ¶54. The other RCAs did not want to do so and opted to transfer or quit instead, leaving the station short-staffed. JA 38 ¶51; JA 467. The

situation in Holtwood alone demonstrated the "chaotic personnel problems" that constitute undue hardship.

The situation was also chaotic at the Lancaster Annex during non-peak season. Other RCAs threatened to boycott. JA 38 ¶51. There was more than just "hearsay" from disgruntled employees. One actually filed a grievance. *Id*. Skipping Groff created a level of dissent that impacted USPS management's ability to properly fulfill its mission. And when it came to Amazon Sundays, there was no room for failure. The impact on morale here had a tangible, detrimental impact on the USPS's operations and therefore was an undue burden.

The district court below credited these and other burdens articulated by the USPS and undisputed by Groff. JA 10, 14, 29-30. Any one of them was sufficient for the district court's grant of summary judgment for the USPS. This Court should, therefore affirm.

**B. *Hardison* remains binding on this Court.**

As the Court has recognized, *Hardison*'s *de minimis* standard is the law. *Protos*, 797 F.2d at 139 n.3 (affirming the application of the *Hardison de minimis* standard). Before the district court, Groff argued that *Hardison* no longer remains good law after *Abercrombie & Fitch*. Having lost that argument, he now softens his tactic—informing this Court that, if he loses on appeal, he will ask the Supreme Court to revisit *Hardison*.

Groff is not the only litigant who has sought to overturn *Hardison*. The employee in *Dalberiste v. GLE Associates Inc.* sought certiorari from the Supreme Court on this issue. Petition for Writ of Certiorari, *Dalberiste v. GLE Associates Inc.*, 141 S. Ct. 2463 (2020) (No. 19-1461). The Supreme Court denied certiorari, without dissent, on April 5, 2021. *Dalberiste v. GLE Assocs.*, 141 S. Ct. 2463 (2021). On three prior occasions, the Supreme Court similarly declined to grant certiorari to address this same legal issue. *Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227 (2021); *Patterson v. Walgreen Co.*, 140 S. Ct. 685 (2020); *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634 (2019).

64

*Hardison* is the prevailing law and has been so for forty-three years. It should be applied here because it is the Supreme Court's binding precedent on both issues. It is the Supreme Court's prerogative to overrule its own decisions. *United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 155 (3d Cir. 2005) (citing *Rodriguez de Quijas v. Shearson/American Express Inc.*, 490 U.S. 477, 484 (1989) and *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

Moreover, to the extent Groff truly urges an amendment or clarification to Title VII, that argument is more properly made to Congress. Congress itself amended Title VII to add the concept of an undue hardship. In the forty-three years since *Hardison* was decided, Congress has declined to change this language or respond in any meaningful way to the decision. Every Congress from 1994 to 2013 considered bills that would have overruled *Hardison*. None passed.[19] To

---

[19] S. 3686, 112th Cong. (2012); S. 4046, 111th Cong. (2010); S. 3628, 110th Cong. (2008); H.R. 1431, 110th Cong. (2007); H.R. 1445, 109th Cong. (2005); S. 677, 109th Cong. (2005); S. 893, 108th Cong. (2003); S. 2572, 107th Cong. (2002); H.R. 4237, 106th Cong. (2000); S. 1668, 106th Cong. (1999); H.R. 2948, 105th Cong. (1997); S. 1124, 105th Cong. (1997); S. 92, 105th Cong. (1997); H.R. 4117, 104th Cong. (1996); S. 2071, 104th Cong. (1996); H.R. 5233, 103d Cong. (1994).

the extent that this highly charged issue of religion in the workplace is addressed, it should be addressed by Congress, the branch of government that more directly represents the will of the people.

## <u>CONCLUSION</u>

The district court properly balanced the competing rights of the USPS and Groff consistent with Congress's statutory scheme set forth in Title VII. Its entry of summary judgment in favor of the USPS should be affirmed.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney

 /s Gregory B. David/LYJ
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division


VERONICA J. FINKELSTEIN
LAUREN DEBRUICKER
Assistant United States Attorneys
615 Chestnut St., Suite 1250
Philadelphia, PA 19106
Veronica.Finkelstein@usdoj.gov
Lauren.DeBruicker@usdoj.gov
(215) 861-8598/8492

Dated: August 27, 2021

# **CERTIFICATIONS**

1.      I certify that this brief contains 12,908 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B) and was prepared in Microsoft Word using 14-point Century Schoolbook font, a proportionally spaced typeface, and therefore complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6).

2.      I certify that the electronic version of this brief filed with the Court was automatically scanned by McAfee Data Exchange Layer, version 6.0.0.241, and found to contain no known viruses.

3.      I certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.


VERONICA J. FINKELSTEIN
Assistant United States Attorney

Dated: August 27, 2021

# CERTIFICATE OF SERVICE

I certify that on the below date this brief was served through the

Electronic Case Filing ("ECF") system on the following counsel of record

in this appeal:

Jeremy L. Samek
Randall Luke Wenger
Independence Law Center
23 North Front Street
Harrisburgh, PA 17101

David Crossett
Cornerstone Law Firm, LLC
8500 Allentown Pike, Suite 3
Blandon, PA 19510

Aaron M. Streett
Christopher E. Tutunjian
Baker Botts, LLP
910 Louisiana Street
Houston, TX 77002

Alan J. Reinach
Church State Council
2686 Townsgate Road
Westlake Village, CA 91361

Hiram Sasser
David J. Hacker
Stephanie Taub
First Liberty Institute
2001 West Plano Parkway, Suite 1600
Plano, TX 75075

Dated: August 27, 2021

*Counsel for the Appellant*

VERONICA J. FINKELSTEIN
Assistant United States Attorney